U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2021 AUG 24   AM 9: 37

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| FATIME ABDEL-FAKHARA, MAURICIO ESTEBAN GARCIA GIRALDO, SYLVANA CARNEIRO HETKA, HRH LINUS NTO MBAH, PAULINA FUENTES MOAD, LINH THI THUY PHAM, AND TONGYI WANG, INDIVIDUALLY, AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS, <br><br> *Plaintiffs*, <br><br> v. <br><br> THE STATE OF VERMONT, DAVID CASSETTY, SUSAN DONEGAN, EUGENE FULLAM, WILLIAM GRIFFIN, JOHN KESSLER, PATRICIA MOULTON, MICHAEL PIECIAK, AND JOHN/JANE DOES 1-10 <br><br> *Defendants*. | Civil Action No. 5:21-CV-198 |

## CLASS ACTION COMPLAINT

Plaintiffs, Fatime Abdel-Fakhara, Mauricio Esteban Garcia Giraldo, Sylvana Carneiro Hetka, HRH Linus Nto Mbah, Paulina Fuentes Moad, Linh Thi Thuy Pham, and Tongyi Wang, individually, and on behalf of similarly situated persons, (collectively referred to herein as "Plaintiffs" or "QBurke-Investors"), by and through their attorneys, Barr Law Group, as and for the Complaint against Defendants, the State of Vermont (including specifically, but not limited to, the State of Vermont Agency of Commerce and Community Development, the State of Vermont Department of Financial Regulation, the State of Vermont Office of the Attorney General), David Cassetty, Susan Donegan, John Kessler, Eugene Fullam, William Griffin, Patricia Moulton, Michael Pieciak, and John/Jane Does 1-10 (collectively referred to as "Defendants") hereby allege and aver as follows:

## TABLE OF CONTENTS

**PAGE**

I. Introduction..................................................................................................................2

II. The Parties..................................................................................................................4

III. Jurisdiction and Venue ..............................................................................................6

IV. Factual Background ....................................................................................................6

V. Causes of Action and Legal Analysis ......................................................................20

   A. The Class Satisfies the Requirements of Rules 23(A) and 23(B)(1)(B) of the Federal Rules of Civil Procedure............................................................................20

   B. Causes of Action.......................................................................................................22

      Count 1: Conspiracy by All Individual Defendants to Deprive Q-Burke Investors of Their Constitutional Rights Pursuant to the Fifth and Fourteenth Amendments to the United States Constitution with Remedies Provided by 42 U.S.C. §1983....................................................................................22

      Count 2: Constitutional Takings Claim Subject to Just Compensation Against the State of Vermont ...............................................................................28

      Count 3: Constitutional Takings Claim With No Due Process Against the State of Vermont ....................................................................................................31

      Count 4: Gross Negligence Against the Individual Defendants ....................33

VII. Prayer for Relief ....................................................................................................34

VIII. Jury Trial Demand..................................................................................................35

## I.   Introduction

1.   In 2007, Ariel Qurios stole millions of dollars from immigrant investors to purchase the "Jay Peak Resort" in Jay, Vermont. There was nothing legitimate about this transaction. The immigrant-investors did not even know the identity, existence, or involvement of Ariel Quiros with Jay Peak.

2.   The investors only knew the outward facing actors for the various Jay Peak investment opportunities (the "Jay Peak Projects"): Bill Stenger, the long running steward and

manager of the Jay Peak ski resort; the Vermont Regional Center (or "VRC"), which was the state run "Regional Center" designated by United States Citizenship and Immigration Services ("USCIS"); and a myriad of government officials who championed the Jay Peak Projects as a way to bring much needed investment to Vermont's "Northeast Kingdom."

3.     The partnership between Jay Peak and the Vermont Regional Center would result in hundreds of millions of dollars flowing into Vermont. Within those projects, however, hundreds of millions of dollars would also be misspent, misused, and flat-out stolen in a Ponzi-scheme that touched every dollar invested.

4.     The full scope of the Jay Peak Ponzi scheme is laid out in various pending and settled litigation, including the case of *Sutton et al v. The Vermont Regional Center*, No. 100-5-17 Lecv (Vt.Superior Court, Lamoille Civil Division). However, this case is not about the broader, decade-long wrongdoing. This case is about the final phase of the Ponzi-scheme, and specifically, the final Jay Peak project known as "QBurke." As explained below, in 2015, with full knowledge of the Ponzi-scheme's detailed machinations, the State of Vermont and the within named Individual Defendants took the QBurke-Investor's money, and they used it to complete the hotel at Burke Mountain, to pay Vermont contractors, and to facilitate the tax revenues that the State continues to enjoy today.

5.     As the Defendants ensured the flow of investor funds, there was absolutely no legitimate investment-interest in QBurke. In fact, while simultaneously raising money, the Defendants laid plans to liquidate the Burke resort as soon as the hotel was built. Specifically, in 2015 the Defendants drafted a complaint detailing the fraud, the Ponzi-scheme, and the securities violations throughout the Jay Peak Projects, including at Burke. While there was no investment interest from the point of view of an EB-5 investor, the State's overriding interest was in ensuring

3

that the ski resort at Burke would avoid the fate of Newport, Vermont (which, in 2015, had a hole the size of a city block in its downtown as the result of the Ponzi-scheme), and ensuring that the dozens of Vermont contractors, materialmen, and suppliers would be paid for their contracts building Burke's hotel.

6.      With no legitimate investment interest left, the State of Vermont embarked on a series of actions ensuring that the Burke Hotel was built, and that the immigrant-investors paid for it.

7.      As detailed herein, the Defendants' actions in this regard can only be viewed as a governmental "taking" within the meaning of the Fifth Amendment of the United States Constitution and, as such, "just compensation" is due.

8.      For the specific named individual Defendant's herein, their actions constitute nothing less than "gross negligence," for which liability is clear and appropriately brought at the individual level by application of 12 V.S.A. § 5602(b).

## II.    THE PARTIES

9.      Plaintiff, Fatime Abdel-Fakhara is a Chad citizen, and resident of N'Djamena, Chad, who invested assets in Q-Burke Mountain Resort, LLC.

10.     Plaintiff, Mauricio Esteban Garcia Giraldo is a Columbian citizen and resident of Cali, Columbia , who invested assets in Q-Burke Mountain Resort, LLC.

11.     Plaintiff, Sylvana Carneiro Hetka, is a Brazilian citizen and resident of Houston, Texas, who invested assets in Q-Burke Mountain Resort, LLC.

12.     Plaintiff, HRH Linus Nto Mbah, is a Nigerian citizen, and resident of Abay Aba, Nigeria, who invested assets in Q-Burke Mountain Resort, LLC.

4

13.    Plaintiff, Paulina Fuentes Moad is a Mexican citizen and resident of Lexington, Massachusetts, who invested assets in Q-Burke Mountain Resort, LLC

14.    Plaintiff, Linh Thi Thuy Pham, is a Vietnamese citizen, and resident of Hanoi, Vietnam who invested assets in Q-Burke Mountain Resort, LLC.

15.    Plaintff, Tongyi Wang is a Chinese and Canadian citizen, and resident of Montreal, Canada, who invested assets in Q-Burke Mountain Resort, LLC.

16.    Defendant State of Vermont is subject to suit in this U.S. District Court pursuant to the Supreme Court precedent in *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 204 L. Ed. 2d 558 (2019).

17.    At all relevant times herein, Defendant, David Cassetty, was the General Counsel of the DFR.  Upon information and belief, he is a Nevada domiciliary.

18.    At all relevant times herein, Defendant, Susan Donegan, was the Commissioner of the DFR.  Upon information and belief, she is a Florida domiciliary.

19.    At all relevant times herein, Defendant, Eugene Fullam, was the Executive Director of the VRC.  Upon information and belief, he is a Massachusetts domiciliary.

20.    At all relevant times herein, Defendant, William Griffin, was the Vermont Chief Assistant Attorney General. Upon information and belief, he is a Vermont domiciliary.

21.    At all relevant times herein, Defendant, John W. Kessler, was the General Counsel for the ACCD and principal administrator of the Vermont Regional Center.  Upon information and belief, he is a Vermont domiciliary.

22.    At all relevant times herein, Defendant, Patricia Moulton, was Secretary of the ACCD who served during the state oversight and administration of the Jay Peak Projects.  Upon information and belief, she is a Vermont domiciliary.

23.     At all relevant times herein, Defendant, Michael Pieciak, was the Deputy Commissioner of the DFR.  Upon information and belief, he is a Vermont domiciliary.

24.     The Defendants Cassetty, Donegan, Fullam, Kessler, Griffin, Moulton and Pieciak are referred to collectively as the "Individual Defendants."

### III. JURISDICTION AND VENUE

25.     This action arises under the authority vested in this Court by virtue of 28 U.S.C §1331, 28 U.S.C. §1343, and the Fifth and Fourteenth Amendments to the United States Constitution.

26.     At all relevant times, as to claims brought pursuant to 42 U.S.C. §1983, all actions described were taken under the color of law.

27.     As to the "gross negligence claims" herein, this Court has original jurisdiction under 29 U.S.C. § 1332 because there is diversity between the parties, and the amount in controversy exceeds $75,000.

28.     Venue is proper pursuant to 28 U.S.C § 1391(b)(2).

29.     Joinder of the Plaintiffs is proper pursuant to Fed. R. Civ. P. Rule 20(1)(a)(1).

### IV. FACTUAL BACKGROUND

30.     "EB-5" is a federal program (administered by USCIS) which enables immigrant-investors to both invest $500,000.00 in a U.S. based project and pursue permanent residence in the U.S.  In simple terms: if an immigrant's investment creates a certain number of jobs within a qualified project, the immigrant-investor qualifies for a "Green Card."

31.     AncBio was the seventh of Jay Peak's EB-5 based investment raises.

32.     QBurke was the eighth EB-5 phase of the Jay Peak's EB-5 investment raises.

33.     Prior to AncBio and QBurke, all of the Jay Peak EB-5 projects were centered at the Jay Peak ski resort.

34.     AncBio was to break ground in nearby Newport, Vermont, and QBurke was a hotel and activity center build-out at the Northeast Kingdom's Burke Mountain Resort.

35.     Prior to the build-out, Burke Mountain was a relatively small, local ski area.

36.     While geographically separated from the first six phases of the Jay Peak Projects, both AncBio and QBurke were tethered to the first six phases by the partnership between Jay Peak and the VRC, as well as the machinations of a Ponzi-scheme that used each successive Phase to cover previously stolen money.

37.     Initially, the Vermont Regional Center was run by the State's Agency of Commerce and Community Development (the "ACCD"); however, as explained in greater detail below, the Vermont Regional Center would grow to include a variety of State agencies, including the Department of Financial Regulation ("DFR"), the Attorney General's Office ("AGO"), as well as all Individual Defendants named herein. As such, all entities and individuals who coordinated in the administration of the USCIS approved EB-5 projects are referred to collectively as the "VRC."

38.     The VRC-Jay Peak partnership was well known to would-be investors and was used as a key selling point. In fact, in early investment offering documents, then Vermont Governor James Douglas provided a speech declaring that "Jay Peak Resort in partnership with the State of Vermont Agency of Commerce has successfully implemented its first job creating EB-5 project."

39.     In 2014, the improprieties at Jay Peak were boiling to the surface. In response, rather than increasing investor protections, the VRC engaged in a campaign that can only be described as self-serving damage control.

7

40.     In July of 2014, the Jay Peak Project known as "AnC Bio" (also known as "Phase 7" of the Jay Peak Projects) was suddenly halted by the VRC and, in the coming months, the "QBurke" project (also known as "Phase 8" of the Jay Peak Projects) was intermittently stopped and started at the command of the VRC.

41.     In November of 2014, the VRC engaged legal counsel in order to assess the Jay Peak securities offerings (known as "Private Placement Memorandum" or "PPMs"). From an investor point of view, the PPMs are the most important part of any EB-5 investment. PPMs contain the actual "subscription agreement," as well as all material disclosures to investors. All projects must be marketed, all money must be raised, and all money must be spent in accordance with the PPMs.

42.     The VRC was ultimately responsible for ensuring the accuracy and completeness of PPMs throughout the Jay Peak Projects. In November of 2014, the VRC retained the law firm of Edwards Wildman in order to review the Jay Peak PPMs, using AncBio's PPM as a reference point.

43.     On November 3, 2014, Edwards Wildman sent a draft report and evaluation of AncBio's PPM (the "Wildman Report"). The Wildman Report outlined deficiencies in the AncBio PPM, as well as directing in detail the information that must be included in all PPMs. Specifically, the Wildman Report contained evaluation and guidance to ensure that investors were not being misled.

44.     The Wildman Report called into question the accuracy and completeness of earlier offering documents, material misstatements in the PPM, misuse of funds in AncBio, as well material omissions regarding liabilities relating to impermissible transactions in the Jay Peak Projects.

8

45. The Wildman Report also stated that the PPMs needed to be updated in order to address undisclosed investment risk.

46. Finally, the Wildman Report makes clear that there should be a correction of Jay Peak's prior representations concerning "success," and that "problems with earlier projects need to be disclosed."

47. On November 3, 2014, the Wildman Report was forwarded to ACCD General Counsel John Kessler, Elizabeth Miller (Governor Peter Shumlin's Chief of Staff), Assistant Attorney General Sarah London, and ACCD Secretary Pat Moulton. It was later shared with VRC Director Brent Raymond, as well as every agency and individual who would join the VRC over the next year-and-a-half.

48. The recommendations of the Wildman Report were not followed. Perversely, the Wildman Report served only to highlight issues that would be concealed from investors moving forward.

49. In late 2014, the DFR joined the ACCD in administering the VRC.

50. On December 22, 2014, ACCD Secretary Moulton and DFR Commissioner Donegan executed a Memorandum of Understanding ("MOU") confirming (amongst other things) that, "[a]s a USCIS approved and designated Regional Center [the VRC] is responsible for… on-going monitoring of approved Regional Center projects to assure compliance with USCIS EB-5 regulations, U.S. immigration laws and regulations and federal and state securities laws."

51. Again, this element of State oversight and control was a pivotal selling point for would-be investors, and, after this collaboration with the DFR, it was publicly reiterated that the "Vermont's Regional Center [was] head and shoulders above all of the approximately 600 regional centers" in the U.S.

9

52.     However, the addition of the DFR did not result in superlative oversight and protection of immigrants' investments, just the opposite.  The following fifteen months would reveal that the VRC's activities worked only to ensure that, at least, an additional $40-million would be spent within the State of Vermont at the expense of every single QBurke investor.

53.     In December of 2014, the VRC began a financial review of all of Jay Peak's EB-5 projects. Following that financial review, the VRC became the true operator of the immigrant-investment raises/expenditures.  The VRC assumed control with full (but unshared) knowledge of the Ponzi-scheme.

54.     As part of its financial review, DFR Deputy Commissioner Michael Pieciak obtained Jay Peak's bank records from Raymond James, which indicated that Ariel Quiros (a key principal of the projects) had been systematically looting Jay Peak EB-5 investor funds for years. Of note, in December of 2014, the VRC Director Brent Raymond also obtained Raymond James bank statements, which similarly evidenced a Ponzi-scheme since August of 2008.

55.     In addition to documenting the Ponzi-scheme, the VRC began to take control of the Jay Peak Projects and the flow of investor-funds.

56.     Over the course of the next months, the VRC directed the redrafting of the AncBio and QBurke offering documents.

57.     These PPMs contained a variety of information and disclosures.  After the redraft, these PPMs included the representation that the DFR, through the VRC, was "ensuring that all immigration and securities laws are being complied with and conducting a financial review of all EB-5 projects within the Vermont Regional Center, including this Project."

58.     To the point of oversight, the PPM mimicked public announcements, including a February 19, 2015 press release regarding the addition of the DFR to the State's EB-5 administration, as follows:

> Business proposals supported by ACCD will be forwarded to DFR to verify compliance with securities regulations. DFR's review will include a careful analysis of business plans and economic studies before approving the project for seeking EB-5 investments. As projects go forward, DFR will monitor their projects and oversee ongoing compliance by requiring quarterly reports, conducting site visits, reviewing documentation, and even auditing as needed...DFR's collaboration with ACCD covers both already-approved projects and new applications.

59.     The PPM disclosures and the February 19th announcement proved to be entirely inappropriate.

60.     At the time of the press release, QBurke had been shuttered by the VRC. In the months that followed, however, the AncBio and QBurke projects would be approved by the VRC despite detailed knowledge of an active Ponzi-scheme. In fact, just one week prior to the February 19th announcement, ACCD General Counsel John Kessler wrote to Secretary Moulton, Director Raymond, and Governor's Legal Counsel Sarah London, indicating that the MOU's between the VRC and Jay Peak should already have been cancelled "based on the record of information [the VRC] possessed."

61.     On or about March 27, 2015, the Jay Peak principals met with VRC officials as well as then-Governor Peter Shumlin.

62.     Also in March of 2015, the VRC told Governor Shumlin about accounting irregularities, transactions that did not make sense, as well as illicit purchases of property and luxury items throughout the Jay Peak Projects.

63.     Following the March 27th meeting, Commissioner Donegan wrote to the now federally-indicted William Kelly regarding moving forward with the AncBio and QBurke projects. Therein, Commissioner Donegan approved AncBio's PPM and lifted the marketing hold that had been placed on AncBio in July of 2014.  Commissioner Donegan also outlined the VRC's role regarding QBurke, effectively placing the VRC in charge of the project.  According to the plan, the VRC accountants would perform financial reviews, approve the flow and use of funds, approve and assist with the drafting of the PPMs (in particular, ensuring that the "disclosures are adequate"), and in so doing, ensure that the project would proceed.

64.     Also in March of 2015, an early draft of what was referred to as the "Spaghetti Map" was circulated amongst the administrators of the VRC and the Governor's office. The "Spaghetti Map" is a graphic depiction of the illegal money-flows at the Jay Peak Projects and misuse of investor funds throughout the Jay Peak Projects

65.     The Spaghetti Map would not be revealed to the public or investors until April of 2016, after all the Jay Peak Projects had been placed into receivership for liquidation.

66.     In her communications, Commissioner Donegan also reiterated that no project could go forward, no money could be raised, and no money could be spent unless the State approved the PPMs.

67.     All Defendants were aware of PPMs, their purpose, and the importance of full disclosure as to material facts. As an example, prior to the approval of the AncBio PPM in March of 2015, on December 24, 2014, Commissioner Donegan wrote to Deputy Pieciak, General Counsel David Cassetty, and the DFR's Christopher Smith, stating: "...our anti-fraud statute requires that disclosure to investors include all material facts concerning the investment. Additionally, best practices say that PPM should disclose all materials facts."

68.     Despite this, the VRC approved AncBio's PPM, which did not disclose the systematic stealing of investor money that was known to the VRC (including the documentary evidence showing impermissible margin loans), and the VRC-approved AncBio PPM did not include any iteration of the Spaghetti Map or any information contained therein.

69.     In March of 2015, DFR Commissioner Susan Donegan, Michael Pieciak, William Griffin and David Cassetty (amongst others within State government) knew that the Jay Peak projects were a Ponzi-scheme. No mention of this was included in the AncBio PPM, which was now being circulated around the world.

70.     In the summer of 2015, DFR Deputy Commissioner Michael Pieciak prepared and distributed a PowerPoint presentation to the Governor's staff, as well as ACCD officials.  The presentations outlined in detail how investor money had been stolen by Quiros and co-mingled among all eight phases (including QBurke), used to purchase luxury real estate, and used to impermissibly purchase Burke Mountain Resort for Quiros himself.

71.     Also included in the Power Point presentation was a slide entitled "Immigration Impact to Investors." Remembering that an EB-5 investor must demonstrate that their investment created a requisite number of jobs (an impossible task in a Ponzi-scheme), the PowerPoint's grim conclusion was that every foreign investor in AncBio and QBurke would have their "Immigration Status Likely Negated."

72.     In a separate presentation, Deputy Commissioner Pieciak described how QBurke funds had already been misused to backfill another Jay Peak phase.

73.     On July 13, 2015, the VRC approved the QBurke PPM, and also lifted the hold on marketing the QBurke PPM to investors.

74.     Neither the AncBio nor the QBurke PPM contain any references to the above referenced PowerPoints or any of the material information contained therein.

75.     Also, in and about the Summer of 2015 (if not sooner), the DFR's General Counsel, David Cassetty, *amongst others*, began to draft a complaint with the Vermont AGO. Neither the AncBio nor the QBurke PPMs contain the "Draft Complaint," nor any references to the information outlined in the Draft Complaint.

76.     The Draft Complaint was prepared by employees of the DFR along with "an army of people at AGO." The draft complaint named as defendants Ariel Quiros, William Stenger, William Kelly, as well as each phase of the Jay Peak Projects, *including specifically AncBio and QBurke*, for "multiple violations of the Vermont Uniform Securities Act." The Draft Complaint laid out in painstaking detail the machinations of the Ponzi-Scheme. The Draft Complaint begins as follows:

> Since 2008, Defendants Ariel Quiros ("Quiros") and William Stenger ("Stenger") have orchestrated a large scale investment scheme to defraud investors participating in the "EB-5 Program"….To date, Defendants have fraudulently solicited and raised at least $402,500,000 and collected at least $40,250,000 in additional fees. *Defendants continue to solicit and raise investment funds for two ongoing EB-5 Projects.* [emphasis added].

77.     The Draft Complaint outlines backfilling, comingling, improper use of brokerage accounts, illegal margin loans, the impermissible use of investor funds for luxury real estate/personal items, and the misuse of investor funds in all eight Jay Peak "projects through the ACCD Regional Center," including serious improprieties with regard to the QBurke project, *in part*, as follows:

> Quiros used investor funds to purchase the Burke Mountain Resort for himself. In 2012, QBurke Mountain Resort, LLC (a company owned by Quiros) purchased approximately 1,211 acres of land at Burke Mountain Resort in East Burke, Vermont for approximately

$6,000,000.00. On or about May 31, 2012, Quiros directed that $7,000,000.00 from the Jay Peak Inc. margin loan account be paid to an agent for the seller of the Resort. All margin loan funds from that account were collateralized by, and eventually repaid with, investor funds from various projects. Quiros later sold a 3.797 acre portion of the 1,211 acre parcel to the QBurke Limited Partnership for the Q Burke project in 2014 for $2,470,000.00. Through a series of actions, Quiros used investor funds to purchase the Burke Resort for himself, and then improperly profited again at the expense of investors by selling a small portion of the Burke Resort to investors at a substantial markup that is not justified by any appraisal.

78.     Unbelievably, the Draft Complaint includes acknowledgment and explanation as to how and why the QBurke PPM – which, again, was simultaneously approved and greenlit by the VRC for marketing investors – was illegal, stating…

> The QBurke offering contains instances of self-dealing that are fundamentally unfair to investors and not adequately disclosed. For instance, the PPM fails to adequately disclose that the Q Burke Limited Partnership will use investor funds to build commercial condominium units and then convey two of the units back to Q Burke Mountain Resort, LLC for no compensation. Additionally, the offering documents contain conflicting and misleading statements regarding the ownership and income distribution of the conference center. Q Burke Mountain Resort, LLC (a company owned by Quiros) sold a 3.797 acre parcel of land to the QBurke Limited Partnership in 2014 for the QBurke project. The fact that Quiros stood on both sides of the transaction, and would substantially profit therefrom, was not adequately disclosed to investors…

> By misleading investors, including but not limited to engaging in the conduct described above related to the making of material omissions and misstatements to investors, commingling of funds, diversion of funds for improper purposes and self-enrichment, and use of funds in ways other than those specifically disclosed to investors, Defendants have violated 9 V.S.A. §5501, which provides that it is unlawful for a person, in connection with the offer to sell, the offer to purchase, the sale, or the purchase of a security, directly or indirectly: 1) to employ a device, scheme, or artifice to defraud; 2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or 3) to engage in an act, practice, or course of business

that operates or would operate as a fraud or deceit upon another person.

79.     The Draft Complaints also states that the "investments took the form of unregistered limited partnership interests (the "Securities") offered in eight private placement memoranda ("PPMs"), *all of which contained materially false and misleading statements and omissions of materials facts*" (emphasis added).

80.     The assertions of "misleading" and "omission," of course, were true, because the approved QBurke PPM made no reference to the facts set forth in the Draft Complaint, the Spaghetti Map, or the PowerPoint presentations. So too, the PPM did not include the VRC's knowledge that QBurke money had been misused to illegally fund the fifth and sixth Phases of the Jay Peak Projects, which was known to Deputy Pieciak and anyone else present at his presentations, as well as all Individual Defendants.

81.     For relief, the Draft Complaint sought the following:

    a.      "[A]n order temporarily, preliminarily, and permanently restraining and enjoining Defendants, and, as appropriate, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from future violations of Sections 5501 and 5301 of the VUSA and from soliciting or accepting funds from any person or entity for any investment in any unregistered offering of securities";

    b.      Enter an order freezing the assets of the Defendants, [including QBurke]"; and,

    c.      "Enter an order appointing the Commissioner as a receiver or conservator."

82.     As of the time of the Draft Complaint, the QBurke phase raised $17,500,000.00 from 35 investors. This Draft Complaint was never filed. Instead, the QBurke phase, with the approval and control of the VRC and the Individual Defendants, resulted in at least $43,000,000.00

being taken from trusting and unsuspecting investors. None of the facts set forth in the Draft Compliant were revealed to the QBurke investors during this time.

83.     Also in the Summer and Fall of 2015, the VRC, including Defendants David Cassetty and William Griffin, took control of the investor funds and released them upon their approval for payment directly to Vermont contractors.

84.     At the time of the Draft Complaint, by USCIS designation, Kessler and Fullam remained the "principal administrators" of the VRC and they were ultimately responsible for the administration of the QBurke EB-5 project. However, despite knowledge of the Ponzi-scheme – as outlined herein – they did nothing stop the investor raises/expenditures, and everything to ensure that they went forward. In fact, both actively participated in marketing and promoting of the QBurke investment raises, even travelling with the Jay Peak principals in order to market the project.

85.     Why would VRC draft a complaint outlining the illegality of both the QBurke PPMs, the illegality of the investment raises, and seek an injunction to halt all investor activities - yet at the same time greenlight the same marketing materials/PPMs (that not only omitted any mention of wrongdoing, but inserted specific DFR representations and assurances that the QBurke project would be in compliance with all laws) thereby enabling the investment raises to continue?

86.     The answer is that, in 2015, the QBurke project was shovel-ready, with tens-of-millions of dollars of contracts with Vermont construction firms, Vermont labor, equipment, and materials waiting to be paid for at the base of the small ski-resort in Burke. Faced with a choice of saving immigrants from the loss of their EB-5 investment, or enriching those within the State of Vermont, the Defendants chose the latter, benefitting the state treasury and residents at the expense of the unwitting immigrant investors.

87.     The Draft Complaint was prepared because the Individual Defendants knew that, from the QBurke investors' standpoint, the project needed to stop.  The Draft Complaint was shelved because, from the State's viewpoint, the project needed to continue.

88.     The QBurke project could have been bonded and completed by the State, or the VRC could have done its job and shuttered the Project.  Both courses of actions, however, would result in evaluation and repercussions through the democratic process of voting.

89.     The QBurke Projects, therefore, were pushed through at the expense of the one group for whom such consequences do not exist – immigrants.

90.     In April of 2016, the hotel at Burke was largely completed and the last of the investor funds were disbursed to the Vermont contractors for the Vermont-based project. Within days thereafter, the Jay Peak Projects – including QBurke – were plunged into liquidation and receivership.

91.     In sum, the Individual Defendants and the VRC concealed the scheme from the QBurke investors to ensure that their money would be spent and lost for the benefit of Vermont.

92.     Lest there be any question about the Defendants' intentions in concealing their maneuverings in this regard, immediately following the liquidation proceedings, the State filed its complaint, which was in substance nearly identical to the Draft Complaint, however, reference to QBurke is notably absent.

93.     The QBurke misappropriations and malfeasance had not suddenly disappeared, rather, it was simply omitted and concealed from what the State would make public.

94.     Equally shocking regarding the QBurke cover-up, on April 5, 2016, DFR's General Counsel Cassetty sent Assistant Attorney General Scott Kline and Governor's Legal Counsel Sarah London two draft affidavits prepared by Deputy Commissioner Pieciak.  One of those

affidavits had "substantive evidence from QBurke" removed, while the other affidavit, the "more robust" version, included the substantive evidence of QBurke misappropriations as follows:

> Instead of simply paying QBurke project expenses, investor funds were used as follows: $1,213,626 was used to pay for project expenses of Lodge and Townhouses and Stateside [Jay Peak phases 5 and 6]; at least $4,887,000 was used to secure a personal line of credit for Quiros, and additional sums were used to repay debt incurred through margin accounts held in the name of other projects….Quiros and Stenger used a system of multiple bank accounts to disguise their fraudulent scheme and to commingle investor funds from multiple projects. For example, the funds used to acquire the QBurke property came from Jay Peak Biomedical investor funds laundered through multiple bank accounts.

95.   The concealment extended beyond investors and even went on to include USCIS. On August 26, 2016, Commissioner Moulton circulated a final draft report to USCIS, which contains a blatantly false statement: "Prior to clearing Burke's revised PPM in July 2015, *DFR's investigation confirmed that previously raised Burke EB-5 monies had been properly used for project purposes*."

96.   The SEC's lawsuit and receivership was announced at an April 14, 2016 press conference with Attorney General William Sorrell, Governor Shumlin, DFR Commissioner Donegan, and Secretary Moulton. Unbelievably, after having misappropriated tens-of-millions of dollars to ensure that a doomed project would be built for no purpose other than to benefit the State of Vermont and its contractors, Secretary Moulton reiterated the long-standing marketing point of the Jay Peak EB-5 Projects, as follows:

> …partnership between ACCD and DFR assures more oversight than most regional centers in the country because we are government run, [and] this partnership between ACCD and DFR assures investors in Vermont projects there is rigorous review of our EB-5 projects, *we have more scrutiny than any other EB-5 regional center in the country*.

97.     Perhaps unwittingly, Secretary Moulton also revealed the sad truth: that the State's "first concern is with the people who work at these resorts..." And this was so, in fact and in practice, even if that first concern meant illegally extracting tens-of-millions of dollars from immigrants relying on the State of Vermont's "best-in-the-country" oversight.

98.     For the first time at that press conference, the Spaghetti Map was revealed to the public and the investors.

99.     A materially accurate PPM would have included the Spaghetti Map, the DFR Draft Complaint, the PowerPoint presentations, and all of the information known to the VRC and the Individual Defendants. Of course, if that information was disclosed, no one in their right mind would have invested, and Burke would have suffered the same fate as Newport.

100.    The Vermont contractors were paid. The Burke hotel continues to generate revenue for the State of Vermont. Both were paid for by the Burke Investors who have nothing left of their investment and have not been compensated in any way.

## V. CAUSES OF ACTION AND LEGAL ANALYSIS

### A.    THE  CLASS SASTISFIES THE REQUIREMENTS OF RULES 23(A) AND 23(B)(1)(B) OF THE FEDERAL RULES OF CIVIL PROCEDURE

101.    The "Class" includes all Investors who invested assets in QBurke Mountain Resort, LLC related to the EB-5 Immigrant Investor Program.

102.    In this case, the "Class" satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

103.    The named Plaintiffs assert claims that are typical of the claims of the entire Class. The named Plaintiffs, like all members of the Class, had assets that were taken by the State of Vermont and put into a Ponzi-scheme. Additionally, the named Plaintiffs, like all members of the

20

Class, never would have invested in QBurke if they were provided with the substantive and material information that the Defendants possessed.

104.    The Class satisfies the numerosity requirement. There were 121 QBurke investors whose assets were taken by the State of Vermont and put into a Ponzi-scheme, who never would have invested in Q-Burke if they were provided with the substantive and material information that the possessed Defendants possessed. The membership of the Plaintiffs' Class is so numerous as to render joinder impractical.

105.    Typicality is also satisfied. The losses suffered by the named Plaintiffs were caused by the same events, patterns of practice, and courses of conduct that give rise to the claims of the other members of the Class. The named Plaintiffs are members of the Plaintiffs' Class and the losses to the named Plaintiffs are based on the same legal theories.

106.    The common questions requirement is also satisfied as the predominant questions of law and fact are common to the Class and the named Plaintiffs, and will resolve at least one issue common to the Class and include the following:

a. Whether the taking of the assets of each of the QBurke investors in the Class by the Individual Defendants was an unconstitutional taking pursuant to 42 U.S.C. §1983.

b. Whether the taking of the assets of each of the QBurke investors in the Class by the State of Vermont without just compensation was a violation of the 5th and 14th amendments to the U.S. Constitution.

c. Whether the taking of the assets of each of the QBurke investors in the Class by the State of Vermont without notice of due process was a violation of the 14th amendment to the U.S. Constitution.

      d. Whether the Defendants failed to exercise even a slight degree of care, in dereliction of their legal duties to each of the QBurke investors in the Class, thereby causing the QBurke investors to be harmed?

107.    The named Plaintiffs will fairly and adequately represent and protect the interests of the class. Further, the named Plaintiffs have no interest antagonistic to those of the Class. The named Plaintiffs have retained counsel who is competent and experienced in complex litigation.

108.    Class certification is appropriate in this matter under Federal Rule 23(b)(1)(b) as adjudications with respect to individual Class members would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

**B.    CAUSES OF ACTION**

**COUNT I**
**CONSPIRACY BY ALL INDIVIDUAL DEFENDANTS TO DEPRIVE QBURKE INVESTORS OF THEIR CONSTITUTIONAL RIGHTS PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WITH REMEDIES PROVIDED BY 42 U.S.C. §1983**

109.    Plaintiffs repeat the allegations herein as if repeated in their entirety.

110.    The Fifth Amendment guarantees "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

111.    This "Takings" protection is incorporated to the States through the Fourteenth Amendment. *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 163 (1998).

112.    A property owner is entitled to "just compensation" at the moment the government takes their property. *Knick v. Township of Scott, PA*, 139 S.Ct. 2162, 2170 (2019). "Because of 'the self-executing character' of the Takings Clause 'with respect to compensation,' a property owner has a constitutional claim for just compensation at the time of the taking. *Id.,* 139 S.Ct. at 2171 (quoting 6 P. Nichols, Eminent Domain § 25.41 (3d rev. ed. 1972)). The Takings clause

applies equally for all property: both real and personal. *Horne v. Dept. of Agriculture*, 576 U.S. 350, 358 (2015).

113.    The government must justly compensate a deprived property owner, even when the property owner retains an active monetary interest in the taken property. *Id.*, 576 U.S. at 362–63.

114.    *Webster's Dictionary* defines "control" as a verb meaning to "exercise restraining or directing influence over."

115.    *Webster's Dictionary* defines "take" as a verb meaning "to get into one's possession, power, or control."

116.    Appropriation, according to *Black's Law Dictionary* (11th ed. 2019), means "[t]he exercise of control over property. . . act of setting aside a sum of money for a specific purpose."

117.    "[A]ppropriation of property [gives] rise to a *per se* taking, without regard to other factors." *Horne*, 576 U.S. at 360.

118.    When any governmental entity deprives an individual "of any rights . . . secured by the Constitution," they may sue the government for that deprivation. 42 U.S.C. § 1983.

119.    A conspiracy claim under §1983 requires (1) an agreement between two or more state actors (2) to act in concert for an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.

120.    In this case, there was unquestionably concerted and intended action by the Defendants to achieve the "Taking." To this end, the Individual Defendants – Donegan, Moulton, Kessler, Fullam, Pieciak, Cassetty, and Griffin, *amongst other* known and unknown conspirators – worked together with full knowledge that the QBurke investor money was being raised and spent for no legitimate investment interest, with the only interest lying in the payments to contractors and the construction of a Vermont based hotel.

121.     Throughout the Jay Peak Projects, the VRC controlled the Jay Peak investment raises and flow of funds through "Memorandum of Understanding" (required by USCIS in order for a project to raise money in participation with the EB-5 program), which gave the VRC the ability to shutter an EB-5 project in the event of any non-compliance, violation of federal or state law, violation of USCIS regulations and, generally, any misuse of investor funds.

122.     The Individual Defendants, acting by and through their authority with the State, specifically effectuated control over investor raises/money at critical junctures, mainly: 1) when Donegan, Kessler, Moulton, and Pieciak worked together to approve and greenlight the QBurke PPM for additional investment raises and marketing (when at the same time, they were equally capable of shuttering the QBurke raise); and 2) when Donegan, Kessler, Moulton, Pieciak, Cassetty, Fullam, and Griffin worked together and approved QBurke immigrant-investment expenditures. At each of these junctures, the Individual Defendants worked in concert to raise immigrant investors funds and make investment expenditures, with full knowledge of the facts and conclusions set forth in the Spaghetti Map, the PowerPoint Presentation(s), and information they had gathered confirming that QBurke was a cog in a Ponzi-scheme.

123.     At each of these critical junctures, the Individual Defendants were fully aware that there was no legitimate investment or immigration interest left in the QBurke Project. Mainly, at each of these junctures, the Individual Defendants were fully aware that the QBurke project was part of a Ponzi-scheme (which, by its nature and definition is only perpetuated by additional investment raises) and that it was to be liquidated. In fact, the VRC's own Draft Complaint claims that liquidation of QBurke was necessary because of the rampant defalcations, the Ponzi-scheme, and the illegal PPM that the Individual Defendants approved.

124.    With the illegal PPM greenlit, on top of the $17.5 million cited in the Draft Complaint, an additional $43 million was raised and approved for expenditure. This money had no legitimate investment purpose. Its only purpose was in paying the Vermont contractors, building the Vermont based hotel at Burke, facilitating tax revenue and economic development, and staving off an incomplete project and eyesore on Vermont's ledger.

125.    Though it does not represent the entire amount taken (which has been concealed from the QBurke Plaintiffs), it is known that at least $28.5 million was raised and spent for QBurke from March 1, 2015 to March 30, 2016.

126.    The Individual Defendants' concerted actions represent a Taking within the meaning of the 5th Amendment. These actions appropriated the QBurke investors' private personal property to fund a project that, as was known by the Individual Defendants, had no potential to provide any investment interest, with the only interest being the advancement of economic development within Vermont by using the QBurke-investors' funds.

127.    In this case, the "foreseeable result" of the Individual Defendants' actions was that the QBurke immigrant-investors would lose their EB-5 investment and the State of Vermont would build a hotel. *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 39, 133 S. Ct. 511, 522, 184 L. Ed. 2d 417 (2012) ("...takings inquiry is the degree to which the invasion is intended or is the foreseeable result of authorized government action.")

128.    Assuming that the expenditures satisfy the 5th Amendment's "public use" requirement, the QBurke investors are entitled to the amount expended with interest.

129.    Governmental reallocation of private property to benefit another private enterprise may satisfy the "public use" requirement, but, when so accomplished, the transfer mandates "just compensation." *Kelo v. City of New London, Conn.*, 545 U.S. 469, 485–86 (2005).

130.     From an investment standpoint, the QBurke investors' money was spent for no legitimate purpose and, assuming that a "public use" was satisfied in appropriating their money for Vermont contractors and hotel infrastructure, "just compensation" is due and easily calculated as the amount taken together with interest from the day of the taking. *Knick v. Township of Scott, PA*, 139 S.Ct. 2162, 2170 (2019) ("[T]he compensation must generally consist of the total value of the property when taken, plus interest from that time.")

131.     In the alternative, in the event that there was *no* legitimate "public purpose" for the Taking, then the result is the same. A Taking with no "public purpose" is unconstitutional, and the remedy is, once again, the return of the taken money plus interest from the time of the Taking. *Id.*

132.     Finally, and as a third alternative, the Fifth Amendment provides that an individual be given *notice* and an *opportunity* to be heard prior to a Taking. *Lingle v. Chevron U.S.A.*, 544 U.S. 528, 543 (2005).

133.     Putting aside the issue of "public use," in this case the Individual Defendants orchestrated their actions so as to deprive the QBurke investors of any notice of the use of their funds (*to wit*, concealing and providing no notice that it was being used to preserve the development rather than a legitimate investment purpose), and again, the remedy for a taking without notice and due process is the same – a return of the property with interest. *Id.*

134.     These investment/monetary transfers were enabled through a process that was wholly unknown to the QBurke investors, and to which the QBurke investors had no meaningfully opportunity to be heard. The Individual Defendants' knowledge set forth in the Spaghetti Map, the PowerPoints, and the Draft Complaint were purposefully kept from the investors, and no investor would have subscribed to the QBurke project – making a $500,000.00 million dollar

investment – knowing that, *inter alia*, it was part and parcel of a Ponzi-scheme and that VRC projections predicted mass-immigration failure.

135.    Further, the QBurke immigrant investors were wholly unaware that their money would be entirely spent at the approval of the Individual Defendants in order to fund a project that would solely benefit the State of Vermont through in-state employment, development, and taxation.

136.    In the context of what was and was not disclosed to the investors, the QBurke investors were not given any legitimate "notice to be heard" in relation to the use of their money.

137.    Each QBurke investor had endless options in hundreds of legitimate EB-5 projects throughout the United States.

138.    Due process was not afforded these immigrant investors, and as such, the remedy is return of their money together with interest from the date of expenditure.

139.    Finally, the dictates of the 5th Amendment and 14th Amendments were well established at the time of the deprivations herein.

140.    Of course, the wrongfulness of the Individual Defendants' conduct is easily observed by the Defendants themselves. As recently remarked by Defendant Pieciak in referring to Jay Peak's William Stenger:

> The Jay Peak developers, including Mr. Stenger, routinely provided the State of Vermont false, misleading and fraudulent information throughout the course of our dealings.    I am pleased Mr. Stenger has taken responsibility for similar deceptive statements to the U.S. government.

141.    Changing the nouns in the prior quote yields the just result prayed for in this case: the Individual Defendants, working by and through the VRC, routinely provided the QBurke investors with false, misleading, and fraudulent information throughout the course of their dealings

in order to ensure that the QBurke investor money would continue to flow into the Vermont based hotel. Taking responsibility for the scheme is mandated by the 5th Amendment.

142.   The public trust would be well served by assuring that public officials, like Commissioner Pieciak, are equally committed to accountability in a case where he and the officials named herein systematically took the QBurke immigrant-investors' money.

## COUNT II
## CONSTITUTIONAL TAKINGS CLAIM SUBJECT TO JUST COMPENSATION AGAINST THE STATE OF VERMONT

143.   Plaintiffs repeat the allegations herein as if repeated in their entirety.

144.   The Fifth Amendment guarantees "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

145.   This "Takings" protection is incorporated to the States through the Fourteenth Amendment. *Phillips*, 524 U.S. at 163.

146.   Again, a property owner is entitled to "just compensation" at the moment the government takes their property. *Knick*, 139 S.Ct. at 2170. "Because of 'the self-executing character' of the Takings Clause 'with respect to compensation,' a property owner has a constitutional claim for just compensation at the time of the taking. *Id.* at 2171 (quoting 6 P. Nichols, Eminent Domain § 25.41 (3d rev. ed. 1972)). This clear command applies to all levels of government: local, state, and federal. *Id.*

147.   Even governmental reallocation of private property to benefit another private enterprise satisfies the "public use" requirement, mandating "just compensation" when done in furtherance of "economic development." *Kelo v. City of New London, Conn.*, 545 U.S. 469, 485–86 (2005).

28

148.   A constitutional "Taking" occurred in this case when the State of Vermont, by and through the VRC, took control of the QBurke immigrant investor money.

149.   Through the VRC, the State of Vermont controlled the Jay Peak investment raises and flow of funds throughout the tenure of the Jay Peak Projects through "Memorandum of Understanding" (required by USCIS in order for a project to raise money in participation with the EB-5 program) giving the VRC the ability to cancel the MOU and shutter an EB-5 project in the event of any non-compliance, violation of federal or state law, violation of USCIS regulations, and generally, any misuse of investor funds.

150.   Additionally, the VRC specifically effectuated full control over Burke investor money at critical junctures, mainly 1) when the VRC approved of and greenlit the Burke PPM for additional investment raises; and 2) when the VRC controlled the approval of immigrant-investment expenditures. At each of these junctures, the VRC chose to raise immigrant investors funds and make investment expenditures, instead of the converse, which would have been to halt the investment raises/expenditures and preserve the immigrant-investor's funds.

151.   At each of these critical juncture points, the VRC was fully aware that there was no legitimate investment or immigration interest left in the QBurke Project. Mainly, at each of these junctures, the VRC was fully aware that the QBurke project was part of a Ponzi-scheme (which, by its nature and definition is only perpetuated by additional investment raises) and that it was to be liquidated. In fact, the VRC's own Draft Complaint claims that liquidation was necessary because of the rampant defalcations, the Ponzi-scheme, and the illegal PPMs that the VRC and DFR approved.

152.   With illegal PPMs greenlit by the VRC and DFR, on top of the $17.5 million cited in the Draft Complaint, an additional $43 million was raised for expenditure by the VRC. This

money had no legitimate investment purpose, and its only purpose was in paying the Vermont contractors, building the Vermont-based hotel at Burke, facilitating tax revenue and economic development, and staving off an incomplete project and eyesore on Vermont's ledger.

153.    The State's actions represent a quintessential government taking, *albeit an unusually brazen and deceptive one.* The State appropriated investors' private personal property to fund a project that, as the State knew, had no potential to provide any legitimate investment interest, and the only remaining interest being in the State of Vermont advancing its own economic development.

154.    "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960). Just as in *Armstrong*, a fair interpretation of this constitutional protection compels the State of Vermont's categorical duty to justly compensate EB-5 investors.

155.    In this case, the "foreseeable result" of the State of Vermont's actions – in particular, controlling both the sale of the QBurke investments and direct control over the expenditures – was that the immigrant-investors would lose their EB-5 investment and the State of Vermont would build a hotel. *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 39, 133 S. Ct. 511, 522, 184 L. Ed. 2d 417 (2012) ("...takings inquiry is the degree to which the invasion is intended or is the foreseeable result of authorized government action.")

156.    The QBurke investors' money was spent for no legitimate purpose from an investment standpoint, and, assuming that a public interest was served in appropriating their money for Vermont contractors and hotel infrastructure, "just compensation" is due and easily calculated

as the amount so taken together with interest from the day of the taking. *Knick v. Township of Scott, PA*, 139 S.Ct. 2162, 2170 (2019) ("[T]he compensation must generally consist of the total value of the property when taken, plus interest from that time.")

## COUNT III
## CONSTITUTIONAL TAKINGS CLAIM WITH NO DUE PROCESS AGAINST THE STATE OF VERMONT

157.   Plaintiff repeats the allegations herein as if repeated in full.

158.   The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

159.   Procedural due process and "just compensation" are the two necessary components for effectuating a permissible government taking of private property destined for "public use." "[The Fifth] Amendment makes clear that it is designed not to limit governmental interference with property rights *per se*, but rather to secure *compensation* in the event of *otherwise proper* interference amounting to a taking." *First English Evangelical Lutheran Church v. Los Angeles County, Cal.*, 482 U.S. 304, 315 (1987) (third emphasis added). A procedural due process violation is shown when: (1) there is an identified, protected property right; (2) the state or state actor deprives an individual of their right; and (3) the deprivation took place without due process. *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2nd Cir. 1994).

160.   Providing procedural due process often means an opportunity to be heard—not in an illusory sense, but meaningful in timing and forum. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Short of a formal hearing, the Constitution demands that government provide *at least* notice before taking private property. *Jones v. Flowers*, 547 U.S. 220, 232 (2006). Arbitrary takings of private property—those without notice, let alone hearing—are impermissible and

violate constitutional due process guarantees. *Lingle v. Chevron U.S.A.*, 544 U.S. 528, 543 (2005). If due process has not been provided, "that is the end of the inquiry;" taken property must be returned to its rightful owner. *Id.*

161.    In this case, at each juncture referred to herein, the State of Vermont, through the VRC, enabled and effectuated the transfer of investors' funds into the QBurke Project.

162.    These transfers were enabled through a process that was wholly unknown to the QBurke investors, and to which the QBurke investors had no meaningful opportunity to be heard. The VRC's knowledge set forth in the Spaghetti Map, the PowerPoints, and the Draft Complaint were purposefully kept from the investors, and no investor would have subscribed to the QBurke project – making a $550,000.00 investment – knowing that, *inter alia*, it was part and parcel of a Ponzi-scheme and that VRC projections predicted mass-immigration failure.

163.    Further, the Plaintiffs were wholly unaware that their money would be entirely spent at the approval of the VRC in order fund a project that would solely benefit the State of Vermont through in-state employment, development, and taxation.

164.    In the context of what was and was not disclosed to the investors, the QBurke investors were not given any legitimate "notice to heard" in relation to their money's use.

165.    Each QBurke investor had endless options in hundreds of legitimate EB-5 projects throughout the United States.

166.    Due process was not afforded the Plaintiffs, and as such, the remedy is return of their money together with interest from the date of expenditure.

## COUNT IV
### GROSS NEGLIGENCE AGAINST THE INDIVIDUAL DEFENDANTS

167.    Plaintiffs repeat the allegations herein as if repeated in full.

168.    The following allegations are pled in the alternative and as against the Individual Defendants outside of the scope of their duties in accordance with 12 V.S.A. §5602 ("this section does not apply to gross negligence or willful misconduct.")

169.    Common-law negligence elements are (1) an established legal duty of care owed to the plaintiff by the alleged tortfeasor; (2) a breach of the duty; (3) the breach causing injury to the plaintiff.    Whereas negligence could be construed as an error of judgment, gross negligence involves a disregard for another's rights that is "heedless and palpable," indicative of "a wholesale absence of care." *Kane v. Lamothe*, 936 A.2d 1303, 1309–10 (Vt. 2007).

170.    Each of the Individual Defendants, by their involvement with the VRC, had a duty to "ensure[] that all immigration and securities laws are being complied with."

171.    In addition, the Individual Defendants had a duty when they took control of the QBurke investments – controlling both the content of the PPM's and the release of the investor money once raised.

172.    At the same time that the PPM was greenlit for sale on the EB-5 markets, the Individual Defendants were fully aware that the PPM violated securities laws, was materially misleading, and omitted key information. The Individual Defendants also knew that the QBurke investment was part of a continuing Ponzi-scheme.

173.    When the Individual Defendants oversaw and approved the expenditure of investor funds, knowing that the QBurke investment project was subject to liquidation (in fact, the very same actors planned receivership and liquidation by their own actions) rather than legitimate investment expectations, these actions constitute (at the least) a "heedless and palpable" disregard for the investor's money and the duties the Individual Defendants assumed in controlling the QBurke investment projects. *See Kane*, 936 A.2d at 1309–10.

174.    Intentionally omitting crucial and damning disclosures, and acting in concert to ensure that the QBurke investor money was spent and lost, constitutes a wanton disregard and "wholesale absence of care."

175.    Justice mandates accountability for these actions.

## VI. Prayer for Relief

WHEREFORE, on the basis of the foregoing, Plaintiffs respectfully pray that this Court:

(a) Assume jurisdiction over this action;

(b) Award "just compensation" pursuant to the 5th Amendment to the United States Constitution;

(c) Order the return of the QBurke investments funds;

(d) Award nominal and compensatory damages in favor of Plaintiffs in an amount subject to proof;

(e) Award punitive damages in favor of Plaintiffs according to federal and state law;

(f) Award reasonable attorneys fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable laws;

(g) Award such other and further relief as this court deems just and proper.

## VII. Jury Demand

Plaintiffs, by and through their counsel, Barr Law Group and pursuant to Fed. R. Civ. P. 38, hereby demand trial by jury of all issues which may be so tried in connection with their Complaint.

Dated: August 24, 2021 at Stowe, Vermont

Respectfully Submitted,

BARR LAW GROUP

By:
Russell D. Barr, Esq.
Chandler W. Matson, Esq.
125 Mountain Road
Stowe, VT 05672
Phone: 802.253.6272
Fax: 802.253.6055
Email: russ@barrlaw.com
        chandler@barrlaw.com

*Attorneys for* FATIME ABDEL-FAKHARA, MAURICIO GARCIA GIRALDO, SYLVANA CARNEIRO HETKA, HRH LINUS NTO MBAH, PAULINA FUENTES MOAD, LINH THI THUY PHAM, AND TONGYI WANG, INDIVIDUALLY, AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS