UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 SEP -6 PM 2: 59

CLERK

BY_____
DEPUTY CLERK

FATIME ABDEL-FAKHARA,
MAURICIO ESTEBAN GARCIA
GIRALDO, SYLVANA CARNEIRO
HETKA, HRH LINUS NTO MBAH,
PAULINA FUENTES MOAD, LINH THI
THUY PHAM, TONGYI WANG, JUSTIN
SINGH, JARED GRESTONI, MAXIM
SMOLENTSEV, Individually, and on
Behalf of a Class of Similarly Situated
Persons,

      Plaintiffs,

      v.

THE STATE OF VERMONT, DAVID
CASSETTY, SUSAN DONEGAN, JOHN
KESSLER, EUGENE FULLAM,
WILLIAM GRIFFIN, PATRICIA
MOULTON, MICHAEL PIECIAK,
JOHN/JANE DOES 1–10,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 5:21-cv-198

**ORDER ON DEFENDANTS' MOTION TO DISMISS**
**(Doc. 17)**

     Plaintiffs are foreign nationals who invested in financing for construction of the QBurke

Mountain Hotel and Conference Center in East Burke, Vermont.  Each plaintiff invested

$500,000 through the federal "EB-5" program.  This program offers foreign investors a path to

citizenship by investing in qualified projects designed to promote economic development and

create jobs in the United States.  Although the hotel was completed and is open for business, it is

currently held by a federal receiver as a result of fraud committed by the principals in connection

with EB-5 investments in Vermont.  Three of the principals have been sentenced to prison terms

for their conduct.  Plaintiffs have received neither the return of their investment nor in many cases the "green card" status they sought through the EB-5 program.

Plaintiffs sue Vermont state officials David Cassetty, Susan Donegan, John Kessler, Eugene Fullam, William Griffin, Patricia Moulton, Michael Pieciak, and ten John/Jane Does alleging that Vermont state officials knew that investment projects designed to promote development at the Jay Peak Ski Area and at a bio-technology research facility in Newport, Vermont were tainted by fraudulent activity but concealed this information from investors. Plaintiffs allege that despite learning of the fraud, defendants continued to solicit investments, exercised control over plaintiffs' investment funds, and released these funds into the fraudulent scheme.  Plaintiffs assert that this conduct constitutes a governmental taking, requiring the state to compensate victims of the scheme (Count III).  Plaintiffs also claim that the individual defendants conspired to deprive plaintiffs of their Fourteenth Amendment property rights and to appropriate plaintiffs' property without just compensation (Counts I, II).  Last, plaintiffs assert that individual defendants' failure to warn investors of the fraud and to ensure that the EB-5 program complied with the requirements of immigration and securities laws amounted to gross negligence under 12 V.S.A. § 5602(b). (Count IV).

In response, defendants have moved to dismiss the action for lack of subject matter jurisdiction, untimeliness, and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. 17-1 at 18.)  The court heard argument on the motion on June 3, 2022.  For the reasons set forth in this opinion, defendants' motion to dismiss is GRANTED in full.

## Statutory and Regulatory Background

This case arises in the context of the EB-5 visa program administered by the United States Citizenship and Immigration Services ("USCIS"). The Immigration and Nationality Act allocates a certain number of visas to qualified immigrants who invest capital in geographic regions of the United States that are rural or suffer from high unemployment. These visas are commonly known as "EB-5" visas.

Eligibility for the EB-5 visa depends upon three requirements. First, the investor must show that he or she has made a qualifying investment. Second, the investor must show that the investment will create or preserve at least 10 permanent full-time jobs for U.S. workers. Third, the investor must establish that he or she is not subject to any of the U.S. immigration admissibility bars, such as a criminal record, unlawful presence in the United States, or affiliation with a terrorist group. 8 U.S.C. § 1153(b)(5)(A)–(D).

An EB-5 visa grants lawful permanent residence and a path to citizenship for the immigrant investor, his or her spouse, and their single children under age 21. *See* 8 C.F.R. § 204.6. The purpose of the program is to promote economic growth, increase export sales, improve regional productivity, create jobs, and increase domestic capital investment. *Id.* § 204.6(m)(6).

Although USCIS administers the EB-5 visa program and ultimately determines eligibility, the agency depends upon USCIS-approved "regional centers" to provide local expertise and oversight for proposed investment projects. *Id.* § 204.6(m). To qualify a project for enrollment in the EB-5 program, a regional center must demonstrate to USCIS that local investment projects will promote economic growth, create jobs, and provide other economic markers to track the projects' progress. *Id.*

3

Regional centers are located across the United States. The majority are private entities. Vermont is one of the few states to establish a regional center within state government. At all times relevant here, Vermont's EB-5 program was administered by the Vermont Regional Center ("VRC"), which was originally operated by the Vermont Agency of Commerce and Community Development ("ACCD"). After concerns developed over the EB-5 investment programs involved in this case, the Vermont Department of Financial Regulation ("DFR") joined in the regulation of EB-5 investment in Vermont in 2015. The mission of a regional center such as the VRC includes the promotion of EB-5 investment opportunities and the review and approval of private placement memoranda ("PPMs") describing the investment and disclosing risks to investors. (Doc. 24 ¶¶ 44–45.) The purpose of enlisting DFR in the operation of the VRC was to enlist the agency's "personnel and resources to supervise financial services and products offered in Vermont in a manner that advances fair business practices and protects the investing public." 10 V.S.A. § 20.

## Facts

The following facts are drawn from the Amended Complaint. These are the facts as alleged by the plaintiffs. They do not represent a finding or determination by the court. Rather, the following paragraphs seek to summarize the plaintiffs' version of the facts for purposes of Fed. R. Civ. P. 12(b)(1) and 12(b)(6). The court has also considered the documents attached to defendants' motion to dismiss. These are the agreements, contracts and other essential documents governing the operation of the VRC. Their contents are not in dispute.

The court has not considered the various emails and other communications attached to the plaintiffs' reply memorandum because the court has already accepted the Amended Complaint as true for purposes of the motion to dismiss. Broadening the record to include

4

individual emails will involve the court in an inquiry in which credibility and interpretation of the authors' intent loom large. That effort, central to a trial, is inappropriate in the setting of Rule 12. *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000) ("[A] district court errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.") (cleaned up).

The QBurke Mountain Resort Project was a proposal for the construction of a hotel and activity center located at the Burke Mountain Resort in Vermont's Northeast Kingdom. (Doc. 24 ¶ 37.) The project was the last in time of eight phases of EB-5 construction projects promoted by Ariel Quiros and others between 2008 and 2015. (*Id.* ¶ 43.) The first six phases financed improvements at the Jay Peak ski resort as well as, improperly, the purchase of Jay Peak by Mr. Quiros from its previous owners. (*Id.* ¶ 76.) The seventh, known as AnC-Bio, was a complete fraud in which immigrant-investors poured $85 million into a non-existent health research facility in Newport, Vermont. (*Id.* ¶¶ 5, 39.) The QBurke hotel project followed AnC-Bio in time.

Plaintiffs describe QBurke as a fraud similar to AnC-Bio. (Doc. 24 ¶¶ 9–18.) Plaintiffs trusted that their EB-5 investments would be spent on a legitimate business venture and would provide a path to citizenship. Instead, their funds were "misappropriated," and in many cases, the investors' residence visas were denied. (*Id.* ¶¶ 102, 132–134.) Today, plaintiffs "have nothing left of their investment and have not been compensated in any way." (*Id.* ¶ 108.)[1]

---

[1] Plaintiffs omit the value of the QBurke hotel in which they hold a first position. Because their money was used to pay construction costs, the development is largely free of liens and has no significant debt. It is not disputed that the hotel is open and that the receiver is currently marketing it. The court and the parties have no information about the scope of any future recovery for the investors. For purposes of the motion to dismiss, the court accepts as true plaintiffs' allegation that they have lost all or a substantial part of their investment.

5

The individual defendants are state officials alleged to have been involved in perpetuating the EB-5 scheme, concealing the scheme from investors, or failing to satisfy their respective duties to oversee the projects and ensure compliance with applicable laws.  David Cassetty is the former General Counsel of DFR; Susan Donegan is the former Commissioner of DFR; Eugene Fullam is the former Executive Director of VRC; William Griffin is the former Vermont Chief Assistant Attorney General; John Kessler is the former General Counsel for ACCD and the former principal administrator of VRC; Patricia Moulton is the former Secretary of ACCD; and Michael Pieciak is the former Deputy Commissioner of DFR.  (Doc. 24 ¶¶ 20–26.)  Jane/John Does 1–10 have not been named or served.[2]

Plaintiffs allege that despite knowing about fraud within the Jay Peak EB-5 program as early as 2014, the individual defendants allowed construction at the various projects to proceed for nearly two years while soliciting new investments.  (Doc. 24 ¶¶ 16–51.)  Plaintiffs allege that throughout 2015, defendants circulated documents showing they knew QBurke was tainted by fraud but did not halt construction or notify investors.  (*Id.* ¶¶ 5–6.)  These documents included early drafts of the now-infamous "Spaghetti Map," which was a "graphic depiction of the illegal money-flows at the Jay Peak Projects and misuse of investor funds throughout the Jay Peak Projects."  (*Id.* ¶ 68.)  Plaintiffs allege that officials in state government concealed this information, continued to solicit investments, "improperly appropriated the QBurke-Investors' money," and used these funds to pay Vermont contractors to complete the hotel.  (*Id.* ¶ 4.)

---

[2] Fed. R. Civ. P. 4(m) provides that if a defendant is not named or served "within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." More than 90 days have passed since the Amended Complaint was filed on November 24, 2021.  The court grants the motion to dismiss the complaint against unidentified defendants without prejudice.

Plaintiffs allege that on several occasions some individual defendants publicly reassured investors that their investments were safe while privately investigating fraud. For instance, VRC reviewed Jay Peak's November 2014 PPM, and "directed the redrafting of" the QBurke offering documents, which stated that DFR was "ensuring that all immigration and security laws are being complied with and conducting a financial review of all EB-5 projects." (Doc. 24 ¶¶ 44, 59–61, 63.) Plaintiffs allege that VRC employees already possessed "detailed knowledge of an active Ponzi-scheme" that went undisclosed to investors. (*Id.*) Plaintiffs further allege that defendants approved QBurke expenditures with "full knowledge" of the Ponzi scheme. (*Id.* ¶ 130.) This "cover-up," plaintiffs assert, involved not only VRC, DFR, and ACCD officials and employees, but also legal counsel in the Governor's and Attorney General's offices. (*Id.* ¶ 102.)

The fraudulent scheme was made public on April 14, 2016, when the Securities and Exchange Commission ("SEC") announced its lawsuit against Ariel Quiros, William Stenger, and their companies. (*Id.* ¶¶ 104–107.)

In May 2017, Plaintiffs filed a civil lawsuit in state court against VRC, ACCD, DFR, Ms. Donegan, Mr. Fullam, Mr. Kessler, Ms. Moulton, Mr. Pieciak, and other state officials not party to this suit. *See* Compl., *Sutton v. Vt. Reg'l Ctr.*, No. 100-5-17 Lecv (Vt. Super. Ct. May 30, 2017); First Am. Class Action Compl., *Sutton*, No. 100-5-17 Lecv (Vt. Super. Ct. June 12,

2017).[3] After review by the Vermont Supreme Court, *Sutton v. Vermont Regional Center*,

212 Vt. 612 (2019), the case returned to state superior court where it currently awaits trial.[4]

---

[3] The court takes judicial notice of the documents filed in the *Sutton* case pending in Vermont Superior Court to establish the existence of the parallel proceedings and to determine the facts alleged by plaintiffs in that case. *Glob. Network Comms., Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (court records are public records susceptible to judicial notice for adjudication of motion to dismiss). However, the court does not take judicial notice of the substance of any filings in *Sutton* "for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (internal quotation and citation omitted).

[4] The original *Sutton* complaint included sixteen tort, contract, and statutory claims. *See* Compl., *Sutton v. Vt. Reg'l Ctr.*, No. 100-5-17 Lecv (Vt. Super. Ct. May 30, 2017). The defendants named in the complaint were the VRC, the ACCD, the DFR, and James Candido, William Carrigan, Susan Donegan, Eugene Fullam, Joan Goldstein, John W. Kessler, Lawrence Miller, Patricia Moulton, Michael Pieciak, and Brent Raymond. (*Id.*) All counts raised in the complaint were raised against all defendants.

The counts raised in the *Sutton* third amended complaint were supplemented by new factual allegations but were otherwise identical to those raised in the complaint. *See* Third Am. Compl., *Sutton v. Vt. Reg'l Ctr.*, No. 100-5-17 Lecv (Vt. Super. Ct. Oct. 25, 2017). One week prior to the Superior Court's decision on the motion to dismiss, the plaintiffs filed a motion to amend the third amended complaint. *See Sutton v. Vt. Reg'l Ctr.*, No. 100-5-17, 2018 WL 9489401, at *1 (Vt. Super. Ct. Apr. 20, 2018). The proposed fourth amended complaint removed defendants DFR, Michael Pieciak, Susan Donegan, William Carrigan, and Joan Goldstein, omitted five claims, and added two new claims. *Id.*; *see also* Fourth Am. Compl., *Sutton v. Vt. Reg'l Ctr.*, No. 100-5-17 Lecv (Vt. Super. Ct. Apr. 13, 2018). The Superior Court dismissed all claims in the third and fourth amended complaints against all defendants, finding all were shielded from liability by absolute or qualified immunity or that the claims otherwise lacked merit. *Sutton*, 2018 WL 9489401, at *18–20.

On appeal, the Vermont Supreme Court reversed the dismissal of, among other claims, the gross negligence claim against defendants Raymond and Candido. *Sutton*, 2019 VT 71A, ¶¶ 44–55. The Court concluded that defendants Miller and Moulton were entitled to absolute immunity, *id.*, ¶ 48, and affirmed the dismissal of the gross negligence claim against defendants Fullam and Kessler. *Id.*, ¶¶ 47, 58.

The only three remaining defendants in the case now pending before the Vermont Superior Court are the ACCD, James Candido, and Brent Raymond. Seventh Am. Compl., *Sutton v. Vt. Reg'l Ctr.*, No. 100-5-17 Lecv (Vt. Super. Ct. Dec. 2, 2021).

<u>Analysis</u>

## I.      Legal Standard

In ruling on a motion to dismiss, the court accepts as true the allegations of the complaint. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2). The court must draw all reasonable inferences in the non-moving party's favor. *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016). Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).

Rule 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

## II.     Takings Clause Claim Against the State of Vermont (Count III)

Defendants argue that the Eleventh Amendment bars Plaintiffs' Fifth Amendment takings claims against the State of Vermont (Count III). (Doc. 17-1 at 23–26.) Because this question implicates the court's subject matter jurisdiction, this issue must be resolved before the court addresses the parties' other arguments. Fed. R. Civ. P. 12(b)(1); *All. for Env't. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006) ("[A] district court must generally resolve material factual disputes and establish that it has federal constitutional jurisdiction . . . before deciding a case on the merits.") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S.

9

83, 101 (1998)); *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Makarova*, 201 F.3d at 113 ("The doctrine of sovereign immunity is jurisdictional in nature . . . .").

The Eleventh Amendment bars suits in federal court against non-consenting states, state agencies, and individual state officers acting in their official capacities. *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015); *Gorton v. Gettel*, 554 F.3d 60, 62 (2d Cir. 2009) (per curiam) (state agencies); *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (state officials); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984) (Eleventh Amendment immunity bars suits against state officials where the state is the real party in interest); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 89 (1989) ("[A]n official-capacity action is in reality always against the State.").

"[T]he preeminent purpose of [sovereign immunity] is to accord States the dignity that is consistent with their status as sovereign entities." *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002). Inherent in the dignity of the state is "the prevention of federal-court judgments that must be paid out of a State's treasury." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). "Accordingly, Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations." *Id.*

Plaintiffs make two arguments in response to the State of Vermont's assertion of sovereign immunity. First, plaintiffs argue that "[b]y agreeing to the Fourteenth Amendment to the Constitution, Vermont has necessarily limited its ability to assert sovereign immunity to avoid a constitutionally-mandated remedy—here the requirement to pay just compensation when

10

the state takes private property." (Doc. 30 at 41.)  Second, plaintiffs argue that the *Ex Parte Young* doctrine provides an exception to state sovereign immunity, permitting their claim against the state to proceed.  (*Id.* at 42–44.)

The court first considers whether the Takings Clause's assurance of just compensation for governmental takings abrogates the states' Eleventh Amendment immunity from suit in federal court.  Concluding it does not, the court addresses whether the *Ex Parte Young* exception to Eleventh Amendment immunity applies.  That question is also answered in the negative.

## A.   The Fourteenth Amendment Does Not Abrogate the Eleventh Amendment's Guarantee of State Sovereign Immunity in the Federal Courts

The Eleventh Amendment removes jurisdiction in the federal courts over suits against states in the absence of consent.  *Hans v. Louisiana*, 134 U.S. 1, 11 (1890) ("[The Eleventh Amendment] did not in terms prohibit suits by individuals against the states, but declared that the constitution should not be construed to import any power to authorize the bringing of such suits.").  The Fifth Amendment, applicable to the states following ratification of the Fourteenth Amendment, assures that no state may take private property for public use without just compensation.  *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 237 (1897) ("Due process of law, as applied to judicial proceedings instituted for the taking of private property for public use means, therefore, such process as recognizes the right of the owner to be compensated if his property be wrested from him and transferred to the public.").  These two constitutional provisions are in apparent tension.  What happens when a party seeks a remedy from federal court for a violation of the Takings Clause by a state?

"Despite the fact that the Eleventh Amendment and Takings Clause date back so long, neither the Supreme Court nor the Second Circuit has decisively resolved the conflict." *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 40 (E.D.N.Y. 2020),

11

*appeal filed* No. 21-467 (2d Cir. Feb. 26, 2021).  In a recent summary order, the Second Circuit affirmed a district court decision holding that the Eleventh Amendment barred a federal takings claim against New York State, a State agency, and a State official sued in his official capacity. *Morabito v. New York*, 803 F. App'x 463, 465 (2d Cir. 2020) (summary order), *aff'g* No. 6:17-cv-6853-MAT, 2018 WL 3023380 (W.D.N.Y. June 18, 2018).

The weight of authority among the circuits supports the Second Circuit's decision in *Morabito*.  In *Robinson v. Georgia Department of Transportation*, 966 F.2d 637 (11th Cir. 1992), the Eleventh Circuit held that the Eleventh Amendment bars a plaintiff's claims "for violation of the Fifth and Fourteenth Amendments for a taking of their property" against a state in federal court.  *Id*. at 638. In *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948 (9th Cir. 2008), the Ninth Circuit agreed, holding that "the constitutionally grounded self-executing nature of the Takings Clause does not alter the conventional application of the Eleventh Amendment." *Id*. at 954.  All other circuits that have taken up the issue have reached the same conclusion. *See, e.g., Bay Point Props., Inc. v. Miss. Transp. Comm'n,* 937 F.3d 454 (5th Cir. 2019) (affirming dismissal of takings claim against state officials on sovereign immunity grounds); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 552 (4th Cir. 2014) (Eleventh Amendment bars Fifth Amendment takings claims against states in federal court); *Garrett v. Illinois*, 612 F.2d 1038, 1039–40 (7th Cir. 1980) (Fifth Amendment takings claim against the state based upon plaintiff's inability to earn income while incarcerated barred by Eleventh Amendment).

The reasoning in these cases rests on two principles.  The first concerns the origin of sovereign immunity as "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by

12

the plan of the Convention or certain constitutional Amendments." *Alden v. Maine*, 527 U.S. 706, 713 (1999)).

The second principle concerns the nearly universal availability of Takings Clause remedies in state courts.[5] Although Congress cannot enact legislation subjecting the states to suit in state courts, *see Alden*, 527 U.S. at 712, the Eleventh Amendment does not prevent states from consenting to be sued in their own courts for damages arising from a governmental taking. *Hutto*, 773 F.3d at 552 (concluding "that the Eleventh Amendment bars Fifth Amendment taking claims against States *in federal court* when the *State's courts* remain open to adjudicate such claims"); *Jachetta v. United States*, 653 F.3d 898, 909–10 (9th Cir. 2011) (the Eleventh Amendment bars claims brought against the State in federal court under the Takings Clause, but state courts must be available to adjudicate such claims).

Plaintiffs seek to avoid a conventional application of the Eleventh Amendment to bar their claim, arguing that by "agreeing to the Fourteenth Amendment to the Constitution, Vermont has necessarily limited its ability to assert sovereign immunity to avoid a constitutionally-mandated remedy—here the requirement to pay just compensation when the state takes private property." (Doc. 30 at 41.) Plaintiffs point to a footnote in *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 317 n.9 (1987):

> The Solicitor General urges that the prohibitory nature of the Fifth Amendment . . . combined with principles of sovereign immunity, establishes that the Amendment

---

[5] Chapter 1, Article 2 of the Vermont Constitution also guarantees compensation for a taking of private property for public use. Vermont case law recognizes that sovereign immunity principles do not bar claims against the state and municipalities for unconstitutional takings. *Griswold v. Town School Dist. of Weathersfield*, 117 Vt. 224 (1952). State legislation provides specific remedies for takings for various public purposes by various agencies. For example, 19 V.S.A. §§ 500–519 governs compensation for taking of property by eminent domain for highway purposes.

itself is only a limitation on the power of the Government to Act, not a remedial
provision. The cases cited in the text, we think, refute the argument of the United
States that "the Constitution does not, of its own force, furnish a basis for a court
to award money damages against the government." Though arising in various
factual and jurisdictional settings, these cases make clear that it is the Constitution
that dictates the remedy for interference with Property rights amounting to a taking.
(internal citations omitted).

*First English Evangelical Lutheran Church* concerned allegations of inverse
condemnation by a municipality. It concerns neither an action against a state nor the Eleventh
Amendment. The decision addresses the issue of what constitutes a taking, not the forum where
the property owner may seek compensation.

Plaintiffs' argument has not gained traction over the years since the *First English*
decision. Certainly a state may waive its rights under the Eleventh Amendment. Vermont has
declined to do so by statute. *See* 12 V.S.A. § 5601(g) ("Nothing in this chapter [waiving
sovereign immunity for tort claims against the state] waives the rights of the State under the
Eleventh Amendment of the U.S. Constitution."). Nor has it waived its rights in this particular
case by removing the case to federal court or by agreeing to make a payment if the court issues a
decision against it. *See Toll v. Moreno*, 458 U.S. 1 (1982) (state's representation that it would
make refunds if it lost on appeal waived Eleventh Amendment rights). Instead, plaintiffs
contend that by ratifying the Fourteenth Amendment, Vermont forfeited (plaintiffs use the
blander term *necessarily limited*) its immunity to an enforcement action in federal court.
Drawing on *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) and a law review note some forty years
later, *Reconciling State Sovereign Immunity with the Fourteenth Amendment*, 129 H. L. Rev.
1068 (2016), plaintiffs argue that the Eleventh Amendment has no application because the
Fourteenth Amendment requires the federal courts to afford them a remedy.

*Fitzpatrick* concerns a separate constitutional exception to Eleventh Amendment
immunity not relevant here. Section 5 of the Fourteenth Amendment provides, "The Congress

14

shall have power to enforce by appropriate legislation, the provisions of this article." No such

legislation applies in this case. In the absence of legislation, state immunity to suit remains in

place. Even when Congress has enacted laws to enforce the Fourteenth Amendment, the

Supreme Court has not endorsed plaintiffs' position that states can be ordered to pay money

damages in federal court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996) ("Even

when the Constitution vests in Congress complete law-making authority over a particular area,

the Eleventh Amendment prevents congressional authorization of suits by private parties against

unconsenting States.") But to keep things simple, *Fitzpatrick* has no application to this case

because there is no federal legislation creating a federal remedy against states for investors in the

EB-5 or similar programs.

### B.    The *Ex Parte Young* Doctrine

Plaintiffs argue that the *Ex Parte Young* doctrine permits their suit against the state

because the state's refusal to repay their losses represents an ongoing violation of plaintiffs'

constitutional rights. (Doc. 30 at 42–43.) Recognizing that *Ex Parte Young* permits litigants to

seek only injunctive relief—not money damages—against the state, plaintiffs argue that the

monetary relief requested "is only incidental to the taking, not compensatory, consequential,

punitive, or any other flavor of retributive penalty," and so sovereign immunity does not bar the

requested relief. (*Id.*)

Defendants respond that the conduct at issue is not an ongoing constitutional violation

because the relief sought is retrospective only and therefore *Ex Parte Young* does not provide an

exception to Eleventh Amendment immunity. (Doc. 36 at 7–9.)

The *Ex Parte Young* doctrine "is a limited exception to the general principle of sovereign

immunity and allows a suit for injunctive relief challenging the constitutionality of a state

15

official's actions in enforcing state law." *CSX Transp., Inc. v. N.Y. State Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir 2002) (quoting *Ex Parte Young*, 209 U.S. 123, 154 (1908)) (cleaned up).  The purpose of the *Ex Parte Young* exception to state immunity is to enforce constitutional guarantees against state officials who violate constitutional standards.

> If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.  The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Ex Parte Young*, 209 U.S. at 159–60.  Over time, the Supreme Court has developed rules limiting the application of this exception to the Eleventh Amendment.

First, for the *Ex Parte Young* exception to apply, the suit must be brought against the state officer personally responsible for implementing an allegedly unlawful state policy—not against the state itself.  *Ex Parte Young*, 209 U.S. at 159–60.  The individual officer enforcing the allegedly unlawful policy must be named as defendant in order to "ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997).  Here, Count III sets out a claim against the State of Vermont, not against any individual official.

Second, the *Ex Parte Young* exception provides only prospective, injunctive relief.  It extends only to claims for ongoing violations of federal law—not to past violations as alleged in the Amended Complaint.  *Coeur d'Alene*, 521 U.S. at 296.  "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law," whereas "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

16

An uncompensated governmental taking that occurred in the past does not constitute an

ongoing violation of federal law. *See Homeowners Fin. Co. v. Lamont*, No. 3:20-CV-01282

(JCH), 2021 WL 4263376, at *10 (D. Conn. Sept. 20, 2021) (takings claim is not an ongoing

violation of federal law); *5465 Route 212, LLC v. N.Y. State Dep't of Transp.*, No. 1:19-cv-01510

(BKS/DJS), 2020 WL 6888052, at *7 (N.D.N.Y. Nov. 24, 2020) (alleged takings do not satisfy

*Ex Parte Young* ongoing violation requirement); *Nat'l R.R. Passenger Corp. v. McDonald*,

978 F. Supp. 2d 215, 231 (S.D.N.Y. 2013) (same).

Plaintiffs accuse defendants of wrongdoing that occurred, at the latest, in 2016 when the

federal receiver seized the Burke Mountain Hotel and all investment in the EB-5 projects ceased.

Plaintiffs do not allege that defendants are continuing to engage in any wrongdoing—other than

that they decline to pay the sums plaintiffs allege they are owed.  Nor have plaintiffs identified a

state law, policy, or regulation that continued to violate plaintiffs' constitutional rights after

2016.  Defendants' appropriation of the property, if any, was completed well before this suit was

commenced, and therefore cannot accurately be described as "ongoing."

The Eleventh Amendment precludes an award of compensatory damages against the

State of Vermont.  *Hess*, 513 U.S. at 48.  This rule applies with the same effect where

declaratory or injunctive relief would require "the state to make a payment in restitution of a past

wrong from the state treasury."  *McDonald*, 978 F. Supp. 2d at 234.  "Whether the payment is

called damages, retroactive payment, or restitution, the effect upon the fisc is the same."

*McAuliffe v. Carlson*, 520 F.2d 1305, 1308 (2d Cir. 1975).  Here, the declaratory relief plaintiffs

seek—stating that "Defendants took private property without due process or just compensation"

and an "[o]rder for the return of the QBurke investment funds" (Doc. 24 at 42)—merely

repackages the damages claims and would require payment from the state treasury for a past

taking. *See 5465 Route 212*, 2020 WL 6888052 at *6–7; *Dean v. Abrams*, No. 94 Civ. 3704
(LAK), 1995 WL 791966, at *2 n.5 (S.D.N.Y. Dec. 26, 1995) ("[D]emand for money damages
and for the return of her property does not qualify" as prospective injunctive relief).

For these reasons, the *Ex Parte Young* exception does not apply. The claim against the
State of Vermont is barred on sovereign immunity grounds.

**III.    Section 1983 Conspiracy Claims (Counts I, II)**

Plaintiffs assert one claim of conspiracy to deprive plaintiffs of their Fourteenth
Amendment Due Process Clause rights (Count I) and one claim of conspiracy to appropriate
plaintiffs' property for public use without just compensation in violation of the Fifth and
Fourteenth Amendments (Count II) pursuant to 28 U.S.C. § 1983. The conspiracy claims are
against all individual defendants.

Defendants seek dismissal of these counts on statute of limitations grounds. They
contend that the alleged takings occurred in 2015 and that Vermont's three-year statute of
limitations governing § 1983 claims ran out in 2018. The complaint was filed on August 24,
2021.

Plaintiffs agree that the three-year statute of limitations applies to § 1983 claims in
Vermont but take issue with the accrual date. (*See* Doc. 30 at 53 ("[F]ederal law controls when a
federal claim accrues, and state personal injury laws . . . determine the statute of limitations
applied to the § 1983 claim").) Plaintiffs argue the claims accrued when they became aware of
the facts giving rise to their claim. Citing the "accrual suspension" doctrine, plaintiffs argue that
the accrual date of the cause of action was suspended while defendants concealed the injurious
acts from plaintiffs. (Doc. 30 at 54–56.) Plaintiffs argue they did not become aware of the facts
alleged in the § 1983 claims until mid-2021 and so the § 1983 claims did not accrue until then.

18

The § 1983 limitations period is determined on the basis of state law. In order to standardize the statutes of limitations for § 1983 claims, the Supreme Court held in *Wilson v. Garcia*, 471 U.S. 261 (1985)[6] that all § 1983 actions should be characterized as actions for personal injuries for the purpose of selecting the governing state limitations period. In reaching this decision, the Supreme Court rejected a piecemeal approach applying the limitations period of the closest state law analogue to the federal claim.[7] Instead, reasoning that Congress intended to remedy the "atrocities" of Reconstruction by passing § 1983, and that these atrocities "plainly sounded in tort," the Court concluded that the most accurate uniform characterization of a § 1983 claim is personal injury. *Id.* at 277.

The statute of limitations for § 1983 claims in Vermont is three years under 12 V.S.A. § 512. *See Shields v. Gerhart*, 155 Vt. 141 (1990) (three-year state statute of limitations for personal injury actions applied to § 1983 action). Accordingly, the court applies a three-year limitations period to the date of accrual of plaintiffs' claims to determine whether the § 1983 claims are time-barred.

Although state law determines the length of the limitations period, federal law governs when a § 1983 claim accrues. *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *see also Kaiser v. Cahn*, 510 F.2d 282, 285 (2d Cir. 1974). Case law establishes that a § 1983 claim accrues at "that point in time when the plaintiff knows or has reason to know of the injury which is the

---

[6] *Wilson* was superseded in part by 28 U.S.C. § 1658, which imposes a four-year statute of limitations for certain civil actions. That statute concerns federal statutory claims not relevant here.

[7] Plaintiffs' statement that state personal injury laws only determine the statute of limitations for § 1983 claims "insofar as they are analogous to the federal claim" is incorrect. (*See* Doc. 30 at 53.) Because plaintiffs' federal claims against individual defendants are brought under § 1983, Vermont's statute of limitations for personal injury actions applies regardless of the underlying nature of the alleged constitutional violation.

basis of his action." *Singleton v. City of N.Y.*, 632 F.2d 185, 191 (2d Cir. 1980) (quoting *Bireline v. Seagondollar*, 567 F.2d 260, 263 (4th Cir. 1977)); *see also Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995) (quoting *Singleton*, 632 F.2d at 191). For a § 1983 claim to accrue, a plaintiff need not know that the defendant's conduct was tortious or unlawful—only that the injury has occurred and its cause. *See* Martin A. Schwartz, *Sec. 1983 Litig. Claims and Defenses*, § 12.03 (4th ed. 2022) (citing *United States v. Kubrick*, 444 U.S. 111, 123 (1979) (accrual of claim is at time plaintiff became aware of "both his injury and its cause"—not when "plaintiff learns that his injury was negligently inflicted.")).

The federal accrual rule depends upon the plaintiff's knowledge of the underlying injury. This is not the same as knowledge that a federally protected right has been violated. A layperson who has been subjected to a governmental taking "may well know that she has been injured, but it often takes a lawyer with expertise in constitutional law to evaluate whether federally protected rights were violated." Schwartz, *Sec. 1983 Litig. Claims and Defenses*, § 12.03 (4th ed. 2022). And even after the injured party understands the legal basis for liability, it may still take months or years of discovery to acquire the factual support to prove the case. But § 1983 accrual decisions identify knowledge of the underlying injury—not knowledge of the federal rights that have been violated or access to the evidence required to prove the violation—as the moment of accrual. *See, e.g., Jardin De Las Catalinas Ltd. P'ship v. Joyner*, 766 F.3d 127, 133–34 (1st Cir. 2014) (accrual occurred on date plaintiffs "were apprised of their injury and the defendant's causal connection to that injury . . . . From that point forward, it was up to the plaintiffs to connect the dots.").

The injury which forms the basis of this action was the alleged taking of Plaintiffs' EB-5 investments. According to the Amended Complaint, the individual defendants had knowledge of

the "systematic stealing of investor money" but continued to release escrowed investor funds to Vermont contractors throughout 2015 and into 2016.  (Doc. 24 ¶¶ 72, 74, 90.)  Plaintiffs did not know or have reason to know of their alleged injury at the time the injuries occurred in 2015 and 2016 because defendants concealed their knowledge of fraudulent activity from investors.

The date that plaintiffs knew or had reason to know of their alleged injuries was April 14, 2016—the day that the SEC announced its lawsuit against Ariel Quiros, William Stenger, and their companies.  (*Id.* ¶¶ 104–107.)  Within days, a federal receiver seized assets held by Quiros, Stenger and others, including the Burke Mountain Hotel.  On April 14, 2016, the "Spaghetti Map" depicting "misuse of investor funds throughout the Jay Peak Projects" was made public. (*Id.* ¶¶ 68, 106.)  And according to the Amended Complaint, April 14, 2016 marks the date that plaintiffs learned about the "illegal money-flows" and were informed that "the Jay Peak Projects had been placed into receivership for liquidation."  (*Id.* ¶ 69.)  Every investor had reason at that point to know that their investment was at risk or, as plaintiffs allege, had been "taken" through operation of the EB-5 program.  "News reports, if sufficiently probative and widely publicized, can trigger accrual, or at least require potential plaintiffs to undertake a reasonably diligent investigation."  *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 188 (E.D.N.Y. 2014).  Because plaintiffs knew or should have known of their legal injury on April 14, 2016,  the three-year statute of limitations expired on April 14, 2019.

In their opposition to defendants' motion to dismiss, plaintiffs rely on the "accrual suspension" rule.  (Doc. 30 at 54.)  Under the accrual suspension rule, "the accrual of a claim against the United States will in some situations be suspended when an accrual date has been ascertained, but the plaintiff does not know of the claim."  *Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009).  "[T]he accrual date of a cause of action will be suspended in only

two circumstances: '[the plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the time the cause of action accrued." *Id.* at 1315 (quoting *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc) (alterations in original)).

Two examples are instructive. Reviewing claims arising out of nuclear testing in the Marshall Islands, the United States Claims Court reasoned that if the government concealed evidence of radiation contamination, plaintiffs' claims would only begin to accrue when plaintiffs developed radiation-induced illness some years later and were effectively put on notice of the radiation contamination. *See Nitol v. United States*, 7 Cl. Ct. 405, 414–415 (Cl. Ct. 1985). Second, an illustration of an "inherently unknowable" injury is the delivery of the wrong variety of fruit tree – a mistake that cannot be discovered until the tree bears fruit. *See Japanese War Notes Claimants Ass'n of Philippines, Inc. v. United States*, 373 F.2d 356, 359 (Ct. Cl. 1967).

Plaintiffs argue that both circumstances apply because "the factual basis supporting this Complaint's claims were shrouded and kept under wraps for years." (Doc. 30 at 55.)

Even if the accrual suspension rule applies to claims against individuals, the result under the accrual suspension rule would be the same as under the diligence-discovery rule.[8] Plaintiffs'

---

[8] The "accrual suspension rule" has only been recognized by the Court of Federal Claims in suits against the United States. *See, e.g., Ingrum*, 560 F.3d 1131 (takings claim against the United States); *Unitrac, LLC v. United States*, 113 Fed. Cl. 156 (Ct. Fed. Cl. 2013) (patent infringement claim against United States); *Japanese War Notes Claimants Ass'n of Philippines, Inc. v. United States*, 373 F.2d at 632 (claim against United States for reimbursement for counterfeit Japanese money issued during Japanese occupation of Philippines). The Second Circuit applies a closely-related "diligence-discovery rule" which postpones the date of accrual where "the government conceals the acts giving rise to the plaintiff's claim, or where [the] plaintiff would reasonably have had difficulty discerning the fact or cause of the injury at the time it was inflicted." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998); *see also Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994) (section 1983 claim accrues "only after [the] claimant knows or has reason to know of both the harm and the cause of the harm").

legal injury is the alleged taking of their property without just compensation. Plaintiffs knew or would have been able to know of the existence of this injury on April 14, 2016. After April 14, their injury was neither concealed nor unknowable. The statutory period does not begin to accrue when "plaintiff obtain[s] a thorough understanding of all the facts." *Japanese War Notes*, 373 F.2d at 359. Nor does the statutory period accrue when "plaintiff has started substantiating its claims by the discovery of evidence." *Id.* Once the plaintiff is on notice of the actual injury and its cause, the claim has accrued.

Plaintiffs argue that the factual basis for their federal claims arose in part from "FBI and IRS interviews made public in early 2022" which had "not even been conducted by mid-2018." (Doc. 30 at 55.) As a result, plaintiffs represent that "the factual basis for Plaintiffs legal injury was inherently unknowable." (*Id.*) But accrual attaches at the point in time at which a plaintiff learns of the *injury* and its *cause*—not the "factual basis" that allows plaintiff to prove defendants' liability for the injury. *See Ingrum*, 560 F.3d at 1315 (concluding that the accrual suspension rule only suspends accrual until plaintiff is on inquiry as to its possible injury); *Japanese War Notes*, 373 F.2d at 359.

To the extent plaintiffs argue that their § 1983 claims accrued after learning of state employees' role in *causing* the harm, this argument is also unsuccessful. It would be reasonable to infer that although Plaintiffs learned of their financial loss at the time of the April 2016 SEC press conference, they might not have learned of the cause of their injury until they learned more about the involvement of the VRC and other state agencies during discovery.

But plaintiffs did not file this lawsuit until August 2021. To avoid dismissal, they must demonstrate that they could not have known of the role of the state defendants in causing their loss before August 2018. This position is not supported by the record. Many other investors,

23

represented by the same attorneys, brought similar claims arising out of the same conduct over a

year before on May 30, 2017. *See* Compl., *Sutton v. Vt. Reg'l Ctr.*, No. 100-5-17 Lecv (Vt.

Super. Ct. May 30, 2017).

In the *Sutton* complaint, plaintiffs allege that state agencies and James Candido, William

Carrigan, Susan Donegan, Eugene Fullam, Joan Goldstein, John Kessler, Lawrence Miller,

Patricia Moulton, Michael Pieciak, and Brent Raymond "administer[ed], promot[ed], market[ed],

and, in the end, profit[ed] from the largest EB-5 fraud in history." *Id.* at 2.[9]

The *Sutton* complaint includes allegations that the VRC and its employees assured

investors of state approval and oversight but failed to deliver on these promises. (*Id.* ¶ 43.) It

also alleges that state employees were on notice that the Jay Peak Projects were misappropriating

funds, but nevertheless continued to solicit funds from investors. (*Id.* ¶¶ 55–58, 106–107.) It

alleges that "representatives of the Jay Peak Projects coordinated with the Commissioner of the

DFR, Susan Donegan, Michael Pieciak, and other members of the VRC Team to craft private

placement memoranda language and offering documents (which included the Jay Peak MOU) to

give the false appearance of state oversight and monitoring." (*Id.* ¶ 184.) The original complaint

asserted claims similar to the conspiracy claims raised in this case, alleging that all defendants

"engaged in a common plan, scheme, and unlawful course of conduct," to deceive investors and

induce them to invest in the projects. (*Id.* ¶ 236.)[10]

---

[9] Defendants David Cassetty and William Griffin were not named as defendants in *Sutton*.

[10] The original *Sutton* complaint included the following claims against all defendants:
(1) fraud; (2) violation of Vermont securities law; (3)–(4) violations of federal securities law;
(5) negligent misrepresentation; (6) gross negligence/willful misconduct; (7) breach of fiduciary
duty; (8) third-party beneficiary breach of contract; (9) constructive trust; (10) mutual mistake;
(11) aiding and abetting breach of fiduciary duty; (12) aiding and abetting fraud; (13) negligence;

24

Allegations of a conspiracy do not alter the statute of limitations analysis. Federal law dictates that a conspiracy accrues at the time the wrongful act occurred:

> Characterizing defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as a single series of interlocking events does not postpone accrual of claims based on individual wrongful acts . . . . The existence of a conspiracy does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs. It is the wrongful act, not the conspiracy, which is actionable, whether that act is labelled a tort or a violation of § 1983.

*Singleton*, 632 F.2d at 192. Put differently, "when a plaintiff knows or ought to know of a wrong, the statute of limitations on that claim starts to run, and the later awareness that the actionable wrong was also part of a conspiracy does not expand the statutory time limit." *Pinaud*, 52 F.3d at 1157. Plaintiffs knew or ought to have known of their legal injuries in April 2016. Certainly they knew of their injuries in May 2017 when their counsel filed similar claims in state court. That they may have connected the dots and concluded that their injury resulted from a conspiracy does not alter the date on which the three-year statute of limitations accrued.

This action was commenced on August 24, 2021. (Doc. 1.) August 24, 2021 is outside the three-year limitations period from the date Plaintiffs knew or had reason to know of their injury and its cause. Accordingly, the § 1983 conspiracy claims against the individual Defendants are untimely and must be dismissed.

## IV.    Gross Negligence (Count IV)

The Vermont Tort Claims Act ("VTCA"), 12 V.S.A. § 5602, imposes restrictions on negligence claims against state employees. "[T]he exclusive right of action for harm to people or property done by state employees who were acting within the scope of their employment is against the State . . . ." *Sutton*, 2019 VT 71A, ¶ 45. Section 5602(b) permits lawsuits against

---

(14) unjust enrichment; (15) violation of the Vermont Consumer Protection Act; and (16) breach of implied contract.

25

state employees in their individual capacity for claims of "gross negligence or willful misconduct." 12 V.S.A. § 5602(b). Such claims are excluded from the restrictions of the VTCA, including the exclusive original jurisdiction of the Vermont superior courts.

Plaintiffs have filed claims of gross negligence against seven Vermont officials who played various roles in oversight of the Vermont Regional Center. The court exercises diversity jurisdiction over these state law claims. (*See* Doc. 24 ¶ 30.) The seven individual defendants and their positions in state government at the relevant time are:

David Cassetty – General Counsel of the Department of Financial Regulation;

Susan Donegan – Commissioner of the Department of Financial Regulation;

Eugene Fullam – Executive Director of the Vermont Regional Center;

William Griffin – Chief Assistant Attorney General;

John Kessler – General Counsel for Agency of Commerce and Community Development;

Patricia Moulton – Secretary of the Agency of Commerce and Community Development;

Michael Pieciak – Deputy Commissioner of the Department of Financial Regulation.

As their titles indicate, all seven individual defendants held high positions in state government during the events recounted in the amended complaint. The first issue for the court to decide is whether some or all of these defendants are entitled to absolute or qualified immunity under Vermont decisional law.

Immunity principles apply in both § 1983 and state tort law settings. The standards are similar. But these standards are derived from different sources. The § 1983 immunity defense has its origin in federal constitutional law. The immunity defense for state officials who are the subject of state law claims originates in Vermont common law. The court has relied upon Vermont Supreme Court decisions applying state immunity law.

26

The distinction between the immunity standards under state and federal law is especially marked in the case of absolute immunity. The question of who receives absolute immunity from § 1983 claims depends on the scope of common law immunity available at the time of enactment of the Civil Rights Act of 1871, 17 Stat. 13. *Rehberg v. Paulk*, 566 U.S. 356 (2012). In contrast, absolute immunity for state law claims is subject to "[a] different analysis altogether." *Levinsky v. Diamond*, 151 Vt. 178, 559 A.2d 1073 (1989). Vermont law "provides absolute immunity for 'high executive' officials such as the Attorney General and agency heads for acts committed within the scope of their authority . . .". *O'Connor v. Donovan*, 2012 VT 27, ¶ 16, 191 Vt. 412, 48 A.3d 584. The criteria for absolute immunity for executive branch officials are two-fold: a sufficiently elevated position and actions undertaken within the scope of official authority.

The court recognizes that it is not writing on a clean slate on the issue of immunity. In *Sutton v. Vermont Regional Center*, the Vermont Supreme Court ruled that Patricia Moulton was entitled to absolute immunity because she was "the highest executive officer in ACCD." *Sutton*, 2019 Vt 71A. Eugene Fullam received qualified immunity. In the case of John Kessler, the Vermont Supreme Court concluded that "plaintiffs could not make out claims of gross negligence against him …". *Id.* ¶ 51. The *Sutton* decision concerned potential liability for investments in improvements at Jay Peak. The conduct alleged in this case comes later in time and concerns the financing of construction of the QBurke hotel. But the duties and positions of the officials –the essential issue for determination of absolute or qualified immunity under state immunity principles – remained the same. While the parties and factual allegations are sufficiently different to defeat a claim of res judicata, the Vermont Supreme Court has already addressed claims of immunity very similar to those raised in this case. In conducting an independent evaluation of the allegations in the Amended Complaint, the court seeks to maintain

27

consistency with the legal rulings already in place in the *Sutton* decision or, if the outcome is different as to any individual defendant, to explain why.

### 1.    Absolute Immunity

Defendants argue that Ms. Donegan and Ms. Moulton are entitled to absolute immunity as high executive officers. (Doc. 17-1 at 48–52.)  Both held cabinet-level positions within state government, serving as leaders of the Department of Financial Regulation and the Agency of Commerce and Community Development.  Plaintiffs respond that Ms. Donegan and Ms. Moulton acted outside the scope of their official duties when they assured investors that the State of Vermont would oversee legal compliance of the EB-5 investments and failed to notify investors that these assurances were going unfulfilled.  Plaintiffs contend that absolute immunity does not extend to such *ultra vires* actions. (Doc. 30 at 76–77.)

Under Vermont law, "[a]bsolute immunity is generally afforded to judges . . . legislators, and the highest executive officers, where the acts complained of are performed within their respective authorities." *Libercent v. Aldrich*, 149 Vt. 76, 81, 539 A.2d 981, 984 (1987).  State agency commissioners "are among the state's highest executive officers." *Curran v. Marcille*, 152 Vt. 247, 249, 565 A.2d 1362, 1363 (1989).  "Such officers are entitled to absolute immunity even when their acts fall within the 'outer perimeter of [their] authority and discretion.'" *Sutton*, 2019 VT 71A, ¶ 46 (quoting *O'Connor*, 2012 VT 27, ¶ 9).

During the relevant period, Ms. Moulton was the ACCD Secretary. (Doc. 24 ¶ 25.)  In *Sutton*, the Vermont Supreme Court held that she was entitled to absolute immunity with respect to a claim of gross negligence, asserted against her as an individual.  2019 VT 71A, ¶¶ 47–48. The *Sutton* complaint alleged that Secretary Moulton failed to adequately oversee the Jay Peak ski area investments and misrepresented the VRC's oversight role to investors (*id.* ¶¶ 159–

28

162).[11]  In concluding that Secretary Moulton was entitled to absolute immunity, the Vermont

Supreme Court recognized that the ACCD was charged with "enhancing Vermont's business

climate, marketing Vermont to businesses and individuals, along with facilitating, promoting and

creating business opportunities within Vermont to contribute to the economic viability and

growth of the State." *Sutton*, 2019 VT 71A, ¶ 48.  Secretary Moulton's responsibilities in

directing the VRC were "in line with ACCD's mission of 'promoting and creating business

opportunities,' and so fell at least within the 'outer perimeter of [her] authority and discretion.'"

*Id.* (citing *O'Connor*, 2012 VT 27, ¶ 9).

The decision of the Vermont Supreme Court that Secretary Moulton was entitled to

absolute immunity is consistent with other cases involving the heads of Vermont agencies.  The

Vermont Supreme Court has held that absolute immunity protects the highest executive officers

at the Department of Social and Rehabilitation Services, *LaShay v. Department of Social and

Rehabilitation Services*, 160 Vt. 60, 64, 625 A.2d 224, 227 (1993), the Department of Motor

Vehicles and the Department of Corrections, *Curran v. Marcille*, 152 Vt. 247, 249, 565 A.2d

1362, 1363 (1989), and the Department of Social Welfare.  *Levinsky*, 151 Vt. 178.  As cabinet-

level officials, these are the highest executive branch employees in state government.

Plaintiffs argue that the Secretary's immunity should be limited to actions expressly

authorized by statute, and "[n]o statute bestows the Secretary of ACCD with authority to act in

the capacity that Defendant Moulton acted." (Doc. 30 at 78.)  Plaintiffs are correct that no statute

explicitly directed the ACCD to perform oversight and regulatory roles in EB-5 projects until the

---

[11] Prior to December 2014 when ACCD and DFR entered into a Memorandum of
Understanding documenting their decision to share oversight of the Vermont Regional Center,
the Center existed as a department within the ACCD.  Legislation enacted in 2015 authorized the
two agencies to cooperate in directing the activities of the Center.  10 V.S.A. § 20.

enactment of 10 V.S.A. § 20 in 2015.  But the ACCD is broadly charged with overseeing economic development, housing, historic preservation, tourism, marketing, and other community development initiatives.  *See* 3 V.S.A. §§ 2471–2477.  ACCD's involvement in the EB-5 program—whose purpose was to bring jobs and investment to Vermont—fell within the ACCD Secretary's official responsibilities.  Secretary Moulton is entitled to absolute immunity for the alleged acts undertaken involving the EB-5 program.

There is a second reason why absolute immunity applies to Commissioner Moulton. Implicit in plaintiffs' argument is the retrospective criticism that no official should receive absolute immunity for taking action that causes harm to an investor.  But absolute immunity is not provided to protect state officials from their successes.  It applies to mistakes, including serious mistakes that cause a loss of money or injury.  It even applies to actions motivated by malice.  "That defendant was allegedly motivated by ill will or a malicious design to interfere with plaintiff's livelihood does not diminish the absolute immunity afforded conduct otherwise within the general scope of defendant's authority."  *O'Connor*, 2012 VT 27, ¶ 27.  Secretary Moulton is entitled to absolute immunity because of the broad range of her official duties and the wide scope of her discretion.  *See Id.* ¶ 7 (citing *Barr v. Matteo*, 360 U.S. 564, 573–74 (1959)).

For the same reasons, the court concludes that Commissioner Donegan is entitled to absolute immunity in her capacity as the former Commissioner of the DFR.  The Commissioner's responsibilities include enforcing and ensuring compliance with Vermont securities laws.  *See* 8 V.S.A. § 11(A)(1); 9 V.S.A. §§ 5603–5604.  In 2015, the Vermont State legislature enacted a statute that brought substantial responsibility for the administration of the VRC within the duties of the DFR Commissioner.  *See* 10 V.S.A. § 20.  Although some of the allegations in the Amended Complaint concern activities undertaken before the enactment of 10

30

V.S.A. § 20, any allegations related to Commissioner Donegan's participation in the securities investigation of the Jay Peak projects fall fully within her statutory authority as the leader of DFR. Like Commissioner Moulton, Commissioner Donegan held a cabinet level position in state government. In that role, she exercised broad judgment and discretion consistent with the duties of a high-ranking executive branch official. The decisions she made concerning the Burke Mountain hotel and the other Jay Peak investments fell within her statutory duty. She is clearly entitled to absolute immunity from the claims asserted here.

### 2.    Absolute Prosecutorial Immunity

Defendants argue that the three DFR Defendants—Commissioner Donegan, Deputy Commissioner Pieciak, and General Counsel Cassetty—are entitled to absolute prosecutorial immunity. (Doc. 17-1 at 53.)[12]  The court has already determined that Commissioner Donegan is entitled to absolute immunity. During the relevant period, Mr. Pieciak was the Deputy Commissioner of the DFR, and Mr. Cassetty was the General Counsel of the DFR. (Doc. 24 ¶¶ 20, 21, 26.) Defendants argue that the DFR Defendants engaged in the role of prosecutors enforcing the state's securities laws and therefore should be protected by prosecutorial immunity for discretionary decisions made in the scope of their authority. (Doc. 71-1 at 41.) In response, Plaintiffs argue that the DFR Defendants did not engage in prosecutorial activities but rather "acted outside the statutory authority of their public office by trying to remedy and resurrect legally insufficient private offering documents." (Doc. 30 at 78.)

---

[12] Mr. Pieciak and Ms. Donegan were named as Defendants in the first *Sutton* complaint, Compl., *Sutton v. Vt. Reg'l Ctr.*, No. 100-5-17 Lecv, ¶¶ 106–109, 181–185 (Vt. Super. Ct. May 30, 2017) but were omitted in the fourth amended complaint, Fourth Am. Compl., *Sutton v. Vt. Reg'l Ctr.*, No. 100-5-17 Lecv (Vt. Super. Ct. April 13, 2018), and so the claims against them were not addressed in the Vermont Supreme Court's opinion.

Prosecutorial immunity "protects judges and the state's highest executive officers, including prosecutors, from civil suits for certain actions 'closely associated' with their judicial or prosecutorial activities, including—among other things—the decision whether to prosecute and the prosecution of the action." *Czechorowski v. State*, 2005 VT 40, ¶ 10, 178 Vt. 524, 527, 872 A.2d 883, 889. "[I]t is well settled under both state and federal immunity standards that a prosecutor's decision *not* to prosecute is entitled to the same absolute immunity from civil suit as the decision to file charges." *O'Connor*, 2012 VT 27, ¶ 23. In contrast to the absolute immunity accorded to agency heads under Vermont law, prosecutorial immunity has a functional component. A prosecutor's actions "outside the area of advocacy, such as investigation or administration, as well as the conduct of lower level public officials," do not receive absolute prosecutorial immunity, but may instead be entitled to qualified immunity." *Czechorowski*, 2005 VT 40, ¶ 10.

### a.      General Counsel Cassetty

Drawing all reasonable inferences in Plaintiffs' favor, the court concludes that Mr. Cassetty is not entitled to absolute prosecutorial immunity for his conduct as General Counsel to DFR. In *Czechorowski*, the Vermont Supreme Court found that the General Counsel for the Department of Aging and Disabilities was entitled to qualified—not prosecutorial—immunity because she engaged in both prosecutorial activities such as responding to discovery requests, preparing legal memoranda, preparing witnesses, and determining whether to proceed with a case) as well as non-prosecutorial activities like conducting investigations and document review. *Czechorowski*, 2005 VT 40, ¶ 13. Although a state's attorney enjoys absolute immunity in state tort actions for any function "within the scope of their authority" as high executive officers, *see*

32

*O'Connor*, 2012 VT 27, ¶¶ 16–18, the same is not true for lawyers employed in other state agencies whose duties are not exclusively those of a prosecutor.

The allegations in the Amended Complaint describe the range of Mr. Cassetty's responsibilities at DFR. Mr. Cassetty engaged in some prosecutorial functions, such as drafting a complaint with the Vermont Attorney General's Office. (Doc. 24 ¶ 81.) But other allegations describe Mr. Cassetty engaging in actions unrelated to criminal prosecution, such as drafting inquiry letters to QBurke developers, overseeing the escrowed investor funds, and general involvement in DFR's regulatory oversight of the VRC. (*Id.* ¶¶ 90, 91.) Mr. Cassetty also provided internal assessments and legal advice to the DFR Commissioner about how DFR could best manage its enforcement activities related to the QBurke project. (*Id.* ¶¶ 74, 81). The claims in the Amended Complaint against Mr. Cassetty principally concern his alleged involvement in the solicitation of investor funds despite knowledge of fraud—not his decision whether to prosecute the QBurke developers after these facts came to light.

Vermont has a well-developed body of law concerning immunity for line prosecutors and other lawyers working in state government. Two lines of authority have emerged.

One line of cases recognizes absolute immunity for chief prosecutors based on their high position and responsibilities. In *Levinsky v. Diamond*, 151 Vt. 178 (1989), the Supreme Court recognized the absolute immunity of the Attorney General and the Commissioner of Social Welfare for alleged misconduct in directing an investigation of a nursing home operator. Both officials were the highest executive officers within their governmental units. As lower-level state employees, their deputies were held to be entitled only to qualified immunity.

In *O'Connor*, the Vermont Supreme Court extended absolute immunity to elected state's attorneys in the same manner as *Levinsky.* These officials are the chief law enforcement officials

33

at the county level. The Court "discern[ed] no sound basis to deny state's attorneys the same immunity for 'high executive officials' that their state counterpart, the Attorney General, enjoys for conduct within the general authority of the office." *O'Connor*, 2012 VT 27, ¶ 21. This absolute immunity does not depend on the nature of the task performed.   Like judicial immunity and the immunity granted to high executives, it derives from the duties of the position and is limited only by requirement that the actions subject to immunity lie within the official's statutory authority.  Subsequent decisions have reached the same result. *See Cornelius v. Barrett-Hatch*, No. 2019-117, 2019 WL 3761430, at \*3 (Vt. Aug. 7, 2019) (mem.) ("Because defendant's action was taken within her general authority as a state's attorney, she has absolute immunity from this civil lawsuit."); *Grega v. Pettengill*, 123 F. Supp. 3d 517 (D. Vt. 2015) (state's attorney entitled to absolute immunity for state tort claims).

A second line of cases extends absolute prosecutorial immunity to traditional functions of the office such as filing charges and prosecuting cases in court.  A lower level prosecutor may receive absolute immunity for quasi-judicial actions by prosecutors such as dismissing or processing a charge from the "police-related" investigation role. *Muzzy v. State ex rel. Rutland County State's Attorney,* 155 Vt. 279, 281 (1990).  Other duties such as overseeing investigations were subject to qualified immunity. *O'Connor* overruled *Muzzy* by extending absolute immunity to individuals holding the position of state's attorney.  But lower-level employees working in prosecutorial roles continue to receive absolute or qualified immunity depending on the nature of their actions. *Sutton,* 2019 VT 71A, ¶ 46 ("The State's other officers, employees and agents are entitled to qualified immunity from suit . . . .").

In *Czechorowski*, the Vermont Supreme Court applied the distinction between absolute and qualified immunity to claims against the general counsel of the Department of Aging and

34

Disabilities. The general counsel received absolute immunity from suit for her role in commencing civil enforcement actions. "The State's vital interest in the free and independent judgment of those charged with the duty of enforcing the elder-abuse prevention law thus compels the extension of absolute immunity to [the attorney's representation of the Department in administrative proceedings]." *Id.* at 529. As in *Muzzy*, actions by counsel to provide legal advice and direct investigations were protected by qualified immunity.

As alleged in the Amended Complaint, Mr. Cassetty's role as General Counsel required him to perform both adjudicative functions and general administrative functions, such as providing legal advice to the DFR Commissioner, overseeing the escrowed investor funds, and general oversight of the VRC. Because his job combined both functions, he is entitled to absolute immunity only for the adjudicative portion of his role. He is eligible for consideration for qualified immunity as to the other functions. Because the court concludes below that he is entitled to qualified immunity, the court will apply that more demanding standard to all claims against Mr. Cassetty and will not attempt to separate out the particular functions and actions for which he may also receive absolute immunity.

### b.   Deputy Commissioner Pieciak

The Amended Complaint also describes the role of DFR Deputy Commissioner Pieciak in the investigation of the QBurke fraud. Plaintiffs allege that Mr. Pieciak obtained bank records from the securities firm Raymond James to aid in the investigation of the Jay Peak projects. (Doc. 24 ¶ 57.) Mr. Pieciak prepared internal PowerPoint presentations outlining how the QBurke fraud had occurred and describing how investor funds had been improperly commingled with other Jay Peak projects. (*Id.* ¶¶ 76–78.) At other points in the investigation, Mr. Pieciak

35

prepared draft affidavits and emailed attorneys for QBurke to negotiate oversight language in the PPMs. (*Id.* ¶¶ 64, 102.)

These functions closely resemble the investigatory and administrative functions which the Vermont Supreme Court found undeserving of absolute immunity in *Czechorowski*. 2005 VT 40, ¶ 10 ("Qualified immunity applies to prosecutorial functions outside the area of advocacy, such as investigation or administration."). And as with Mr. Cassetty, the allegations against Mr. Pieciak do not focus on his decision not to prosecute the QBurke developers. Instead, the allegations concern his role in furthering the solicitation of investor funds after the fraud was known to state officials and his role in failing to disclose this fraud to investors. Drawing all reasonable inferences in plaintiffs' favor, the allegations against Mr. Pieciak in the Amended Complaint do not entitle him to absolute immunity.

### 3.   Qualified Immunity

Defendants argue that all the individual defendants who are not entitled to absolute or prosecutorial immunity are entitled to qualified immunity as "lower-level" employees. (Doc. 17-1 at 55–56 ("[T]he allegations against the Individual Defendants show that each was performing a discretionary act in good faith within the scope of his authority.").)

In response, plaintiffs argue that all lower-level employees were either executing non-discretionary functions or otherwise failed to act in good faith in an objectively reasonable manner. (Doc. 30 at 78–81.)

Lower-level state officers, employees, and agents are entitled to qualified immunity while "1) acting during the course of their employment and within the scope of their authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial acts." *O'Connor*, 2012 VT 27, ¶ 6 (alteration and quotation omitted). The good faith standard

"depends on the objective reasonableness of the official's conduct in relation to settled, clearly-established law. Thus, if the official's conduct does not violate clearly established rights of which a reasonable person would have known, the official is protected by qualified immunity from tort liability." *Sprague v. Nally*, 2005 VT 85, ¶ 4, 178 Vt. 222, 882 A.2d 1164 (quoting *Cook v. Nelson*, 167 Vt. 505, 509, 712 A.2d 382, 384 (1998)); *Amy's Enters. v. Sorrell*, 174 Vt. 623, 625, 817 A.2d 612, 617 (2002) (mem.). If "plaintiffs cannot show either that defendant's conduct in responding to their complaint was ministerial rather than discretionary in nature or that defendant acted in bad faith or violated clearly established law, defendant is immune from their lawsuit." *Baptie v. Bruno*, 2013 VT 117, ¶ 16, 195 Vt. 308, 88 A.3d 1212.

### a.   Mr. Pieciak

Defendants argue that Mr. Pieciak is entitled to qualified immunity and to statutory immunity under 8 V.S.A. § 17. Section 17 of Title 8 shields the DFR Commissioner and any DFR officer, employee, or agent from civil or criminal liability "for any act done or omitted in good faith in performing the functions of his or her office." As a DFR officer, Mr. Pieciak is entitled to assert immunity under this statute.

In considering these two independent bases for qualified immunity—one derived from common law and the other from a state statute—the first question is whether the "good faith" element is the same. Section 17 of Title 8 is a relatively recent statute. Originally enacted in 1999 as part of a broad overhaul of the Department of Banking and Insurance (as DFR was then known), it was amended in 2007 to extend immunity to additional state officials not relevant here. It has not been cited by the Vermont Supreme Court. The court concludes that there is no basis for interpreting "good faith" as it appears in 8 V.S.A. § 17 in a manner different from the use of the term in existing qualified immunity case law in Vermont. The court will interpret § 17

to impose the same objective standard of good faith.  There is no evidence in the text of the statute or in Vermont case law that § 17 was intended to expand immunity to include a subjective standard—sometimes referred to as "the pure heart, empty head standard"—requiring a determination of the motivation or understanding of a state official.  A subjective standard would expand potential immunity to include acts performed as a result of an official's unreasonable beliefs.  The court will take a more restrictive view, extending statutory immunity only when there is an objective basis for a good faith determination.  The result is that the immunity analysis is the same under qualified immunity principles derived from case law or the statutory immunity afforded by § 17.

At its heart, plaintiffs' claim against Mr. Pieciak is that through his investigation of the Jay Peak principals, he learned about the fraud and raised the alarm internally while the ACCD and DFR continued to allow new investment in the Burke Mountain Hotel project.  (Doc. 24, ¶¶ 57, 64, 73, 74, 76–78.)  Defendants respond that plaintiffs have failed to establish that Mr. Pieciak acted in bad faith because there is no clearly established right "to have a complex securities-fraud investigation proceed in any particular way." (Doc. 17-1 at 58 (citing *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12–13 (S.D.N.Y. 2016)).)  But plaintiffs' allegations of bad faith go beyond the manner in which Mr. Pieciak and his colleagues conducted the securities fraud investigation.  Plaintiffs allege Mr. Pieciak's actions were not objectively reasonable because he knew it was unlawful to offer to sell securities "by means of any untrue statement of a material fact or any omission to state a material fact," and "allowed [] this law to be violated" because he knew the PPMs did not disclose the SEC investigation to investors.  (Doc. 30 at 81 (quoting 15 U.S.C. § 77q(a)(2)).)

No clearly established law required Mr. Pieciak to disclose to investors that state or federal securities regulators were investigating fraud.   Similar issues have arisen in the context of federal officials responsible for regulating the financial markets.

In *United States v. Gaubert*, 499 U.S. 315 (1991), the Supreme Court considered the potential liability of federal officials for negligent regulation of a savings and loan association. To a degree greater than alleged here, the federal regulators were deeply engaged in day to day management of the troubled thrift, including advocating for a merger with another financial institution, seeking the appointment of new officers and directors, advising the directors concerning possible bankruptcy for a subsidiary and maintaining a "constant federal presence." *Id*. at 381.  The Supreme Court applied the discretionary function exception under the Federal Tort Claims Act to bar any governmental liability for negligence despite the allegations that the federal regulators were involved in directing daily operations of the thrift.

The FTCA differs from its Vermont equivalent in providing no exception for individual liability for gross negligence.  A negligence claim can only be filed against the United States. But cases following *Gaubert*, including *Ratheal v. United States*, 2021 WL 3619901 (10th Cir. 2021)(SEC immune from suit for release of information about violations) and *Molchatsky v. United States,* 778 F.Supp. 2d 421 (S.D.N.Y. 2011)(immunity from claim of failure to investigate Ponzi scheme) stand for the proposition that a federal official's decision-making is discretionary even if she is guiding the daily operations of the entity she is regulating.   As these cases demonstrate, the federal government would be immune from the type of lawsuit filed here through application of the discretionary act doctrine.

Cases against state regulators are more difficult to locate.  The *Sutton* decision supplies one significant example.  In *Sutton*, the Vermont Supreme Court considered both the potential

liability of the State of Vermont for negligence and claims of personal liability for state officials
for gross negligence. The decision concluded that the actions of the Vermont Regional Center
did not involve discretionary decision-making. "The challenged omission is the failure to
conduct oversight of the Jay Peak Projects in the manner the VRC undertook to – and
represented to investors that it would –oversee them." *Sutton*, 212 Vt. at 626. The state now
awaits trial on that claim in Vermont Superior Court.

The *Sutton* decision applied the qualified immunity standard to four lower-level state
employees who were not entitled to absolute immunity. Eugene Fullam, former executive
director of the VRC, was alleged to have marketed and solicited investors for the Jay Peak
projects. Those allegations were held to be insufficient to defeat his claim of qualified immunity
or to support a claim of gross negligence. A second employee, John Kessler, general counsel for
the Agency of Commerce and Community Development, was also alleged to have engaged in
marketing and solicitation of investors. Plaintiffs alleged that "he made representations as to the
[VRC's] oversight, and that he disregarded the warnings of securities violations. *Id*. at 628.
Because these allegations were held to be insufficient to make out a claim of gross negligence,
the court did not reach the issue of qualified immunity.

Two state officials were less fortunate. In the case of Brent Raymond, also a former
director of the VRC, the Vermont Supreme Court ruled that allegations that he made
"misrepresentations to investors about the financial oversight that the VRC provided over the
projects, then later said the VRC could not and would not provide financial oversight and would
not investigate the claims of fraud; acted to protect the Jay Peak Projects instead of the investors;
and then even in the face of complaints alleging that the Projects were misappropriating funds,

40

approved the Projects to solicit more investors" was sufficient to show that his conduct failed the test of good faith. *Id.* at 629.

In the case of James Candido, another former executive director of the VRC, the decision described plaintiffs' allegations that he promoted the Center's role as an independent overseer in meetings with potential investors and purported to conduct an audit-visit to the resort that resulted in a glowing but inaccurate report. In the court's view, these allegations also failed the good-faith test.

The *Sutton* decision applied what it called "structurally similar" standards for gross negligence and qualified immunity in dismissing Mr. Kessler's case on the merits and denying qualified immunity to Mr. Raymond and Mr. Candido. Mr. Kessler's case was dismissed despite allegations that he misled investors by misrepresenting VRC's role as an independent auditor and regulatory watch dog. Such statements suggested "questionable judgment but do not demonstrate failure to exercise even a slight degree of care, owed to another." *Id.* at 632 (cleaned up). In contrast, the plaintiffs alleged that Mr. Raymond and Mr. Candido failed "to ensure that any real oversight was conducted" and "actively worked to protect the Jay Peak Projects from oversight and investigation and covered up fraud within the Projects." Id. at 631. The claims against them of gross negligence were not subject to dismissal because of the allegations that they intentionally prevented the investors from learning about the fraud in the EB-5 projects.

The court draws two lessons from the *Sutton* decision concerning qualified or statutory immunity. First, the decision holds that the "good faith" standard for immunity under state law does not depend solely upon a search for prior examples of cases in which state officials were held personally liable for failing to prevent fraud in a private investment offering. The decision

41

cites none because there are none.   See Plaintiffs' Opposition to Defendant's Motion to Dismiss
(Doc. 30) at 57-58 ("For good reason, 'clearly established' caselaw containing the fact-pattern
here does not exist – the contested governmental conduct was unquestionably non-
governmental.") Similar federal cases such as *Gaubert* went the other way.   Instead, the decision
highlights an alternative criterion, previously recognized in cases like *Amy's Enterprises v.
Sorrell*, 174 Vt. 623 (2002) and *Long v. L'Esperance*, 166 Vt 566 (1997), that is whether an
"officer of reasonable competence could have made the same choice in similar circumstances."
*Amy's Enterprises*, 174 Vt. at 625.   If no reasonable officer would have taken the alleged action,
the officer is not entitled to qualified immunity.   This is a necessarily circular standard since an
action that rises to the level of gross negligence is by definition likely to be one that no
reasonable official would undertake, but it does represent the current state of the law in Vermont
in cases involving financial regulators.

Second, the critical distinction between the officials who received immunity (or whose
cases were dismissed because the allegations did not add up to gross negligence) was whether
the official had actively taken steps to deceive the investors.   Claims against Mr. Fullam were
dismissed on qualified immunity and gross negligence grounds because the allegations were that
Mr. Fullam did no more than "market[] and solicit[] investors." *Sutton*, 212 Vt. at 628.   Claims
against Mr. Kessler were dismissed on gross negligence grounds despite allegations that "he
made misrepresentations as to the VRC's oversight and that he disregarded warnings of
securities violations." *Id.* at 628.   Mr. Raymond and Mr. Candido remained in the case because
they exaggerated VRC's role as an independent overseer in the course of meeting with investors
to promote the investments. *Id.* at 629.   Mr. Raymond "approved the Projects to solicit more
investors" despite "complaints alleging that the Projects were misappropriating funds." Id. at

629. Mr. Candido visited Jay Peak and issued a highly favorable report for distribution to potential investors. It is fair to say that the Vermont Supreme Court declined to dismiss these two officials because of their active promotion of the investment despite knowledge of evidence of fraud.

The court turns to the specific allegations against Mr. Pieciak. The Amended Complaint alleges that Mr. Pieciak, in his capacity as former DFR Deputy Commissioner, participated in the Jay Peak fraud investigation and corresponded with QBurke developers to draft the PPMs. (Doc. 24 ¶¶ 57, 64.) Plaintiffs allege that although Mr. Pieciak knew of the "Ponzi-scheme," he allowed the PPM to circulate even though it did not warn investors about the fraud or potential litigation. (*Id.* ¶¶ 73, 76, 78.) The Amended Complaint further alleges that Mr. Pieciak drafted two affidavits, one disclosing misconduct at QBurke and one omitting QBurke reference to misconduct. (*Id.* ¶ 102.) Mr. Pieciak is also included in the group allegations contained in the Amended Complaint. (*Id.* ¶¶ 128, 130.)

As described in the Amended Complaint, Mr. Pieciak's role was to investigate the fraud and to propose changes to the PPM to protect investors. In plaintiffs' view, he failed to do enough and allowed the investment to remain open after he and his agency knew about the fraud. Plaintiffs cannot identify any clearly established law requiring Mr. Pieciak to act sooner or in some different way to protect the investors. Rather, they rely upon the alternative standard defined in the *Sutton* ruling that no reasonable official could have acted in the same manner. But how a regulator responds to growing evidence of fraud is highly variable. There is no playbook. Taking the facts as alleged, Mr. Pieciak and the agency he led faced a dilemma. Should his agency move quickly to close down investment in a project that was nearing completion or were there other measures such as an escrow account to direct the investors' money to the appropriate

43

source?  The court concludes that this is hardly a case in which no reasonable official could have taken the second course.  In hindsight, one would wish that the QBurke project had turned out differently.  But in the moment, as decisions had to be made at DFR, there were a range of discretionary choices that Mr. Pieciak and others could have made, including waiting for the SEC to complete its investigation and file its lawsuit in May 2016.  For these reasons, Mr. Pieciak is entitled to statutory immunity under 8 V.S.A. § 17.

In the alternative, Mr. Pieciak is entitled to qualified immunity because at all times alleged in the Amended Complaint, he was engaged in discretionary activities and was acting in good faith within the scope of his authority. The Amended Complaint does not allege any conduct by Mr. Pieciak that exceeds his statutory authority.  DFR is charged with investigating securities violations. 9 V.S.A. § 5602(b).  All of the factual allegations against Mr. Pieciak involve the manner in which he conducted an investigation of the fraud and took steps to protect investors.  Such conduct lies within the statutory authority granted to the DFR and its officers.

Nor does the Amended Complaint demonstrate that Mr. Pieciak engaged in non-discretionary or "ministerial" acts.  "A discretionary function is an act which requires the exercise of judgment in its performance, or, in the alternative, where there is no specifically dictated course of action for the employee to follow." *Amy's Enters.*, 174 Vt. at 617.  Because conduct undertaken during or in furtherance of an investigation "requires substantial judgment in terms of means and manner, the act of investigation is a discretionary one." *Id.*

Defendants cite *Sutton* for the proposition that the financial compliance reviews were not discretionary, and so any employees involved in conducting the reviews—or assuring investors that these reviews would occur—were not engaged in discretionary decisions. (Doc. 30 at 79–80.)  In *Sutton*, the Vermont Supreme Court evaluated whether the discretionary function

44

exception to the State's waiver of sovereign immunity in the Vermont Tort Claims Act applied. *Sutton*, 2019 VT 71A, ¶ 40 (citing 12 V.S.A. § 5601(e)(1)).[13] The Vermont Supreme Court held that "[o]nce the State had undertaken to conduct such compliance reviews, conducting them was no longer a discretionary function." *Sutton*, 2019 VT 71A, ¶ 43.  But this analysis concerned the agency-wide obligation to perform a specific function the agency had assured investors it would undertake.  The opinion recognized that individual state officials would still retain "some discretionary decisions as to how to carry out the reviews, monitoring, and auditing," even after the state had committed to conducting the compliance reviews.  *Id.*   Mr. Pieciak's actions concerned the manner in which DFR conducted the investigation – clearly a discretionary function.

Plaintiffs further argue that in his capacity as a DFR employee, Mr. Pieciak assumed the PPM's "guarantee" that DFR would "ensur[e] [] all immigration and securities laws are being complied with," (Doc. 30 at 80) and this "guarantee" rendered his obligation to ensure compliance non-discretionary.  But the PPM was not an agreement between Mr. Pieciak and the investors.  Although the Amended Complaint alleges that Mr. Pieciak emailed attorneys for AnC and QBurke "to negotiate 'oversight' language in the PPMs," the PPM did not create a ministerial duty for Mr. Pieciak to conduct financial compliance reviews in a particular way. (Doc. 24 ¶ 64.)  Mr. Pieciak's functions related to "consulting with the Commissioner, rendering advice, and drafting" are "functions that unquestionably required the exercise of discretion and judgment," and are therefore discretionary. *Czechorowski*, 2005 VT 40, ¶ 13.

---

[13] Section 5601(e)(1) states that Vermont's waiver of sovereign immunity does not apply to claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a State agency or an employee of the State."

Finding that Mr. Pieciak was, at all times alleged in the Amended Complaint, acting in

the course of his employment and within the scope of his authority, and was performing

discretionary acts in good faith, the court concludes that Mr. Pieciak is entitled to qualified

immunity.

### b.   Mr. Cassetty

The Amended Complaint alleges that Mr. Cassetty, in his capacity as General Counsel of

the DFR, knew that the Jay Peak Projects were a "Ponzi-scheme" but did not disclose this

knowledge in the PPM.  (Doc. 24 ¶ 73.)  The Amended Complaint also alleges that Mr. Cassetty

drafted a complaint with the Vermont Attorney General's Office (*id.* ¶ 81), "used false pretenses

and material omissions to assume control of the escrowed investor funds and released them upon

their approval for payment" (*id.* ¶ 90), and wrote letters to the QBurke developers requesting

"critical QBurke documents" (*id.* ¶ 92).  Last, the Amended Complaint alleges that Mr. Cassetty

sent two affidavits drafted by Mr. Pieciak, one mentioning QBurke misappropriations, and one

omitting QBurke misappropriations.  (*Id.* ¶ 102.)  Mr. Cassetty is also included in the group

allegations contained in paragraphs 128 and 130, which describe action by individual Defendants

to "take" investors' property and approve investment expenditures with knowledge of fraud.

Like Mr. Pieciak, Mr. Cassetty was a DFR officer and is entitled to assert statutory

immunity under 8 V.S.A. § 17 for "any act or omission to act done in good faith."

To the extent that the allegations against Mr. Cassetty overlap with those against Mr.

Pieciak, the court concludes that Mr. Cassetty is entitled to statutory and qualified immunity on

the same basis as Mr. Pieciak.

The sole allegation against Mr. Cassetty *not* raised against Mr. Pieciak is that Mr.

Cassetty "used false pretenses and material omissions to assume control of the escrowed investor

46

funds and released them for their approval." (Doc. 24 ¶ 90.) The Investor Escrow Agreements ran between the individual investors and People's United Bank, N.A. as the Escrow Agent. An example appears at Doc. 17-5. Neither DFR nor ACCD are parties to these agreements. But, of course, they are not strangers to the agreements either. The agreements condition release of the escrow funds to QBurke to fund construction of the hotel upon either the approval of permanent resident status or notice that the Vermont Regional Center "no longer requires escrow of investment funds for the Project." As the Amended Complaint states, the VRC approved the release of the funds to complete construction.

Plaintiffs attribute the decision to release the funds to Mr. Cassetty and to defendant William Griffin to a desire to complete the construction of the hotel in order to benefit local contractors, laborers, and material suppliers. Plaintiffs describe two alternatives. "The QBurke could have been bonded and completed by the State, or the VRC could have done its job and shuttered the Project." (Doc. 24, ¶ 94.) They describe the choice in stark terms. "Faced with a choice of saving immigrants from the loss of their EB-5 investment, or enriching those within the State of Vermont, the Defendants chose the latter, benefitting the state treasury and residents at the expense of the unwitting immigrant investors." (*Id.*)

The court accepts plaintiffs' version of the facts as true. The Amended Complaint describes the growing awareness of the fraud among state officials. The court accepts as true the allegation that Mr. Cassetty and other officials could have acted sooner to cut off the flow of investment to the project. But that is not the issue. The issue for purposes of qualified immunity is whether clearly established law made Mr. Cassetty's decision unlawful. The answer lies in the amended complaint itself which describes the difficult policy choice faced by Mr. Cassetty and other Vermont officials. (Doc. 24, ¶¶ 93–96.) He and others could have withheld permission to

47

pay construction invoices, leading to non-completion of the hotel. (The option of using state money to complete the hotel is implausible.) Or he could approve the payments in order to complete the project. Each course had costs and perils. According to the Amended Complaint, he chose to approve the payments.

As with Mr. Pieciak, the Amended Complaint does not allege that Mr. Cassetty induced investors to buy securities using false statements or material omissions. Nor have plaintiffs identified any other clearly established law that Mr. Cassetty violated. His conduct meets the objective good faith criteria for qualified immunity. The decisions Mr. Cassetty made were clearly discretionary. The court follows the Amended Complaint in identifying the choices available. The Amended Complaint does not allege any conduct by Mr. Cassetty in excess of his statutory authority. DFR is charged with investigating securities violations and carrying out related investigatory responsibilities. 9 V.S.A. § 5602(b). The allegations against Mr. Cassetty fall within that authority. Accordingly, Mr. Cassetty is entitled to statutory immunity under 8 V.S.A. § 17 and in the alternative to qualified immunity.

### c.    Mr. Griffin

The Amended Complaint alleges that Mr. Griffin, in his capacity as the Vermont Chief Assistant Attorney General, "knew that the Jay Peak Projects were a Ponzi-scheme" (Doc. 24 ¶ 73), and that Mr. Griffin "used false pretenses and material omissions to assume control of the escrowed investor funds and released them upon their approval for payment directly to Vermont contractors." (*Id.* ¶ 90.) Mr. Griffin is also included in the group allegations contained in paragraphs 128 and 130, discussed above.

These allegations do not establish that Mr. Griffin acted in bad faith or outside the scope of his authority in performing ministerial functions. The authority of the Deputy Attorney

48

General is outlined at 3 V.S.A. § 153(b) and is largely co-extensive with the authority of Assistant Attorneys General and state's attorneys under 3 V.S.A. § 153(c) and 24 V.S.A. § 361(a).

Plaintiffs describe Mr. Griffin as an official "able to approve when investor funds could be moved from escrow to the doomed Burke project." (Doc. 30 at 70.) Plaintiffs allege that after defendants learned about "years of fraud and misappropriation within the Jay Peak Projects," they "fashioned an agreement with Project developers" to create an escrow account for investor money. (Doc. 24 ¶ 162.) Mr. Griffin undertook this responsibility in the context of an ongoing investigation. Although Mr. Griffin's role in overseeing the escrowed funds is not explicitly authorized by statute, this responsibility falls within the "outer perimeter" of his investigatory authority and discretion. *Levinsky*, 151 Vt. at 187, 559 A.2d at 1080 (quoting *Blake v. Rupe*, 651 P.2d 1096, 1106 (Wyo. 1982)).

Plaintiffs' remaining allegations against Mr. Griffin concern his role in the years-long investigation of potential fraud at Jay Peak and Burke Mountain. This investigation was well within the scope of Mr. Griffin's authority as an Assistant Attorney General. And because investigations require "substantial judgment in terms of means and manner," Mr. Griffin's role in the investigation was discretionary, not ministerial. *Amy's Enters.*, 174 Vt. at 617.

No clearly established law requires attorneys within the Office of the Attorney General to conduct their investigations in a particular way or to inform at-risk parties when an ongoing investigation uncovers evidence of fraud. In other contexts, Vermont statutes prescribe the manner in which an investigation must be carried out. For instance, where a state agency learns of child abuse or neglect, it must consider specific factors in deciding whether to pursue an assessment, and in cases of "substantial child endangerment," the state agency "shall" conduct an

investigation. 33 V.S.A. § 4915(b)–(d). Failure to meet statutory obligations in this context would subject the agency—and potentially its officers—to liability. *See Stocker v. State*, 2021 VT 71, ¶ 13, 264 A.3d 435, 442 (recognizing claim for damages arising out of failure to meet statutory obligations against state agency). But in this case, no statute or decisional law obliged Mr. Griffin to conduct the investigation in a particular fashion, or to disclose the investigation to investors at a specific time. For this reason, the conduct alleged in the amended complaint meets criteria for objective good faith. Mr. Griffin is entitled to qualified immunity.

### d.   Mr. Fullam

The Amended Complaint alleges that Mr. Fullam, as the "principal administrator" of the VRC, "actively participated in marketing and promoting of the QBurke investment raises." (Doc. 24 ¶ 92.) The only other allegations naming Mr. Fullam in the Amended Complaint are the group allegations contained in paragraphs 128 and 130, described above. (*Id.* ¶¶ 128, 130 (Describing action by individual Defendants to take investors' property and approve investment expenditures with knowledge of fraud).)

The Vermont Supreme Court determined in *Sutton* that Mr. Fullam was entitled to qualified immunity. The Court determined separately that "the allegations in the complaint would be insufficient to establish gross negligence . . . ." 2019 VT 71A, ¶ 50, n.9. The only new allegation against Mr. Fullam in the Amended Complaint is that he was the "principal administrator" of the VRC. (Doc. 24 ¶ 92.) None of the facts alleged establish that Mr. Fullam was acting outside the scope of his authority, acting in bad faith, or performing non-discretionary acts. *O'Connor*, 2012 VT 27, ¶ 6. Accordingly, Mr. Fullam is entitled to qualified immunity.

e.   **Mr. Kessler**

The Amended Complaint alleges that Mr. Kessler, in his capacity as General Counsel for the ACCD and principal administrator of the VRC, wrote to Ms. Moulton, Mr. Raymond, and the Governor's Legal Counsel Sarah London advising that "the MOU's between the VRC and Jay Peak should already have been cancelled." (Doc. 24 ¶ 63.) The Amended Complaint alleges that Mr. Fullam "did nothing [to] stop the investor raises/expenditures, and everything to ensure that they went forward," and "actively participated in marketing and promoting of the QBurke investment raises." (*Id.* ¶ 92.) Mr. Kessler is also included in the group allegations contained in Amended Complaint. (*Id.* ¶¶ 128, 130.)

In *Sutton*, the Vermont Supreme Court found Plaintiffs had not stated a claim for gross negligence against Mr. Kessler for his role in marketing and soliciting investors, making misrepresentations as to the VRC's oversight, and disregarded warnings of securities violations. *Sutton*, 2019 VT 71A, ¶¶ 51, 56, 58. Although these allegations suggested "questionable judgment," the Vermont Supreme Court concluded that Mr. Kessler's conduct did not rise to the level of gross negligence and therefore did not reach the question of whether he would be entitled to qualified immunity.

The allegations against Mr. Kessler in *Sutton* are substantially similar to those alleged in the Amended Complaint. The Amended Complaint omits allegations made in *Sutton* that Mr. Kessler made specific misrepresentations directly to investors. And the Amended Complaint does not allege that Mr. Kessler actively worked to shield the QBurke project from oversight and covered up fraud, as Plaintiffs alleged Mr. Candido and Mr. Raymond had done.

None of the allegations in the Amended Complaint establish that Mr. Kessler took action outside his statutory authority as General Counsel for the ACCD. As with Ms. Moulton, Mr.

51

Kessler's involvement in the EB-5 program fell within the statutory authority of the ACCD to oversee economic development. Nor does the Amended Complaint allege that Mr. Kessler engaged in anything other than discretionary acts. Mr. Kessler provided legal advice to the ACCD and the VRC, and declined to halt the investor raises. Rendering legal advice and deciding whether or not to open an investigation are discretionary functions. *See Czechorowski*, 2005 VT 40, ¶ 13.

Plaintiffs fail to establish that Mr. Kessler acted in bad faith or contrary to clearly established law. Mr. Kessler's role in marketing and promoting the QBurke investor raises does not defeat his assertion of qualified immunity. *Cf. Sutton*, 2019 VT 71A, ¶ 50 (Mr. Fullam entitled to qualified immunity despite allegation that he marketed and solicited investors for the Jay Peak Projects). And none of the facts alleged in the Amended Complaint show that Mr. Kessler acted objectively in bad faith. On the contrary, Mr. Kessler appears to be one of the first to advise that the MOUs should have been cancelled given evidence of fraud and misconduct. (Doc. 24 ¶ 63.) Accordingly, plaintiffs have not established that Mr. Kessler violated clearly established law or acted in bad faith. He is entitled to qualified immunity.

The court makes one final point before concluding. As in the case of every ruling on a motion to dismiss, the court has considered the facts only from the plaintiffs' side. The individual defendants have a very different view of the reasons they acted as they did. Describing that version lies beyond the court's assigned task here. As this case demonstrates, fraud by trusted individuals requires financial regulators and other state officials to make decisions in the midst of a complex investigation. Immunity doctrine exists because these decisions are difficult and because a decision that harms someone should not lead to personal

financial ruin for the official charged with making these decisions in real time and without the benefit of hindsight.

## Conclusion

Defendants' Motion to Dismiss (Doc. 17) is GRANTED.  Count III against the State of Vermont is dismissed with prejudice because improved pleading will not change the outcome of a strictly legal ruling.  All other counts are dismissed without prejudice.

Dated at Rutland, in the District of Vermont, this 6 day of September, 2022.

Geoffrey W. Crawford, Chief Judge
United States District Court